(No. 21185.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. HOWARD C. BONHAM, Plaintiff in Error.

*Opinion filed April 23, 1932—Rehearing denied June 10, 1932.*

CLARENCE P. SMITH, and EMORY SMITH, (HAROLD L. LEVY, and ELWYN E. LONG, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Howard C. Bonham, (herein called defendant,) was indicted and tried in the criminal court of Cook county for the murder of Paul Tulupan. The jury returned a verdict of guilty and fixed his punishment at death. Motions for a new trial and in arrest of judgment were overruled and he was sentenced to death in accordance

with the verdict of the jury. He has sued out a writ of error from this court for a review of the record.

The evidence in this record establishes the following facts that are not controverted: Paul Tulupan was manager of the small grill of the Claridge Hotel, located at 1244 North Dearborn street, in the city of Chicago, in Cook county, Illinois. He was a small man, of the age of thirty-seven years, about five feet and four inches tall and weighed between 135 and 150 pounds. He was murdered while in the peaceful pursuit of his business in the grill on the evening of December 13, 1930, about twenty-five minutes after 7:00 o'clock. The man who killed him entered the grill about fifteen minutes before 7:00 o'clock P. M. of the date aforesaid and sat on one of six stools on the south side of the counter in the grill, and ordered, and was served by Tulupan, a meal on the counter before him. During the forty minutes that Tulupan's assailant remained in the grill and during the time he was eating his meal he drank two or three cups of coffee, and during all that time he remained seated on the stool he had selected until the instant he arose to kill Tulupan. Tulupan, just before he was killed, walked up in front of, and was facing, the man who shot him, to collect cash from one of his customers, and the cash register was then open. At that very moment, and without giving Tulupan any information or warning whatever, the man on the stool arose from his seat, drew a sawed-off shot-gun that was concealed underneath his overcoat, and immediately aimed and fired it at Tulupan. Tulupan was killed outright, dropped to the floor and never made a struggle, so far as the evidence shows. His assassin instantly ran around the end of the counter to the cash register behind it, took the money out of the cash register and ran out the front door leading to Dearborn street. Before the lunch counter, and behind the stool on which the assassin sat, and perhaps to the right of him, there were a few tables, at which patrons of the grill were served meals. Most, if

not all, the six stools at the counter were occupied by customers just after the assassin took possession of the stool he occupied. At the time the shot was fired only two other guests of the grill occupied stools at the counter. They sat on the two stools immediately to the left of the assassin's stool, and, so far as the evidence shows, there was only one other guest in the grill. He occupied a seat at a table behind the stools. He was not a witness in this case. Only two persons were behind the counter at the time the shot was fired, one of whom was Tulupan and the other was Mrs. Evelyn Andrews, the only waitress at the grill then on duty, and she was standing by the side of Tulupan, facing the assassin, when Tulupan was killed. There was no other male person waiting on patrons at that time. Consequently there are only three witnesses in this case who were present when Tulupan was murdered: Mrs. Andrews, Miss Hulda Gold and Alan Paletz, the latter being an employee of the Mutual Life Insurance Company of Baltimore and who had attended law school about three years but never obtained a "law degree."

The discharged shot from the shot-gun struck Tulupan on his right side, "just at the nipple," and produced at its entrance a wound measuring exactly one-half inch in diameter, and the shot passed through the body, making a cone-shaped wound two inches in diameter at the point where the shot left the body, "shattering the fourth and fifth ribs and the ninth posterior rib" and "shattering the right and left lung and a portion of the heart," and small metallic shot were "scattered through the tissues" of the body. A firm, round plug of felt, or card-board plug, was found in the body and removed from it by a physician. The felt or card-board plug is commonly known as a "shot-gun wad." The shape and scope of the wound were evidently produced by reason of the fact that the deceased was not more than three feet from his assailant when the shot-gun was fired. The man who killed Tulupan was described in the record

as being about five feet eight or nine inches tall, weighing about 160 pounds, was an American, had high cheek bones, was thin-faced and appeared to be "quite good natured." During the entire course of his meal he wore his hat and overcoat. He wore his hat in the ordinary way—it "was not down over his face." The grill was brilliantly lighted with electric lights, all the lights in the grill being lighted.

The main question in the case presented to this court for decision is, Does the evidence in the record show, beyond a reasonable doubt, that defendant is the man who shot and killed Tulupan? A correct decision of that question requires a simple, and only a brief, statement of the material facts testified to by the witnesses whose evidence bears directly on that question, and we shall now present that evidence in what we believe to be its natural and most logical order, without unnecessary repetition by the witnesses of their evidence establishing the facts already stated that are not controverted.

Two policemen of Chicago, Herbert L. Preston, who got to the grill about three minutes after Tulupan was shot, and Patrick Duggan, who arrived there about one or two minutes later, testified that on that evening a light snow, about half an inch deep, had fallen; that they learned that the man who ran out of the door after Tulupan had been shot ran south on Dearborn street to a passageway at 1234 North Dearborn street and into the passageway; that they followed the foot-prints in that passageway and saw that the man who made them ran west to the end of that passageway, then turned north into a yard, went across the yard and over a fence into an alley, and thence south in the alley to an ash-can back of about No. 1231 North Clark street—the first street west of North Dearborn street; that from the ash-can they followed the foot-prints south in the alley to about No. 1209, where they turned into a yard; that in that yard they found lying on the ground the hat introduced in evidence as People's exhibit 3. They found in

the ash-can a "sawed-off shot-gun," which had in it an empty shell. The shot-gun, with its contents, was marked as an exhibit for the State and was later offered in evidence, but it was excluded as evidence by the court on objection of defendant's counsel. Another policeman of Chicago, Paul Mazeika, arrested defendant on December 21, 1931, at No. 18 West Ohio street, Chicago, and found in defendant's flat in which he was arrested, and took to the police station, defendant's overcoat. It was marked People's exhibit 4, was admitted by defendant's counsel to be defendant's coat, and was admitted in evidence by the court without objection. Policemen Preston and William Mendell, the first officers to arrive at the grill after the murder was committed, found no one in it. They found the body of Tulupan behind the counter. Leaving Mendell to guard the grill, Preston went into the hotel lobby, assembled the persons he suspected to be in the grill when the shooting occurred and sent them to the police station to make statements. The people that later assembled there were warned not to touch any of the dishes and glasses and other articles on the counter, and were finally excluded when Linderman and Lindstrom, the finger-print experts, arrived and took charge of the counter and its contents and began their work of taking finger-prints.

The material evidence of the three witnesses for the State that were in the grill when Tulupan was killed, and of the other witnesses for the State, that has any bearing on the question of defendant's guilt, omitting such parts of it as merely tend to establish the facts not controverted, is as follows:

Mrs. Evelyn Andrews: She was on duty that evening as a waitress at 6:30 o'clock and remained there until Tulupan was shot. The man who shot him sat in front of the counter, on the third stool from the front door. He wore his hat and overcoat during the entire course of his meal. His overcoat was "sort of gray" and had a black stripe. His

hat was gray and had a black band. She has seen many gray hats with black bands like the one on his hat and thinks his hat was the "prevailing fashion" for the fall and winter time. He wore it in the grill "just in the ordinary fashion"—it was not "down over his face." When he came into the grill he sat down immediately. She was then waiting "on the tables." "I looked at him when he came in; I had not seen him before." The stools at the counter at that time were about full of customers and there were persons eating at the tables. She remembers that when he killed Tulupan there were only two other persons on the stools in front of the counter—Miss Hulda Gold and a man called Al. She did not know his last name. They were sitting on the two stools "next to the end of the counter"— "on the fourth and fifth stools" from the front door. That man stood up between the second and third stools, beside the stool he had been sitting on, fired a shot, took the money out of the cash register and ran out the front door. She was standing beside, and west of, Tulupan when he was shot and did not hear the man who shot him say anything. Tulupan was just the width of the counter—three feet— from that man when shot. She did not see the weapon. She talked with that man during the course of his meal. He asked for another cup of coffee, and she served him and told him there would be an extra charge for it. She gave him his check for his meal. He never paid it. She did not observe him all the time he was in the grill. Off and on she watched him. She "looked" at him when she gave him his check. She got a "look" at him when he fired the shot. She was within two or three feet of him. She had seen him four or five times during the forty minutes he was in the grill. She had at least "four good looks" at him. "In spite of that I am not sure that he [the defendant] is the man" that fired that shot. She was shown People's exhibits 3 and 4 and testified that the hat is exactly like the one worn in the grill by the man that fired that shot. The

overcoat is also exactly like the one worn by him that night. "As far as I can remember, he [the defendant] doesn't look any different from the man who shot and killed Tulupan." When she talked with defendant at the jail in February, 1931, she asked him if he knew her. He said he never had seen her before in his life. She told him he knew who she was. He said he did not know who she was and asked her if she was against him. She told him she was against him, and he then told "them" to take her away. She also said on cross-examination that she told the coroner's jury on December 14, 1930, "I think his eyes were hazel or gray and that he was a blond type and sandy complexion." She did not know the color of his hair. She did not see it. On re-examination she testified that she served as a waitress Alan Paletz prior to the shooting. She did not after the shooting touch anything on the counter. She does not think anybody touched the dishes after the shooting.

Alan Paletz: December 13, 1930, he had his dinner at the Claridge grill with Miss Gold. He sat on the third stool from the door. Miss Gold sat at his left. Defendant sat on the stool to his right. He was there when "I got there, about twenty minutes before the shooting." He heard the shooting there that night. Defendant got up from his seat, took his check up, made a move as if to pay it, opened up his coat and took out some implement. Witness did not see it in the haste. He heard the shot. He dropped to the floor and saw defendant run out the door. He saw Tulupan just before the shot was fired. After the shot Tulupan dropped. Witness then ran to the hotel lobby. He observed how defendant was dressed. He states that the hat and top coat (People's exhibits 3 and 4) are the hat and top coat that defendant wore that evening. He saw the hat on defendant's head and the top coat on his body. There was something unusual about defendant's conduct that night that attracted his attention to him. He had been smoking rather incessantly and the smoke filled witness'

face. Witness turned and looked at him "as if to resent that action." He looked at witness and then witness got a good glance of his features—just got one glance. He did not stop smoking. He was just at witness' right all the time. The stools were about a foot apart. At no time during the course of the meal did defendant remove his hat. No other persons in the grill had their hats and top coats on. "I heard one shot; I could not say what the weapon was at that time." This man did not turn his head when he ran to the door but witness got a side view of his face. As he went out of the door his back was towards witness. After the man left the door he did not return. The side view of his face was not the view upon which witness passed judgment and identified him as the man that shot Tulupan. Witness took quite a long stare at this man—approximately twenty seconds. Defendant stared at him. The next time he saw defendant was on December 24, 1930, at the East Chicago police station, in a cell. Nobody was in the cell with him. After he left that station he went to the Hudson avenue police station and returned to the East avenue station accompanied by Captain Condon and officers Preston and Mendell and saw defendant again at a "show-up" of two men, including defendant. At that time he did not know defendant was arrested. He had never before heard his name. The lock-up keeper addressed him as "Laddy" and accompanied witness and pointed out where to look in the cell. "I saw Bonham after he had been called." He had a very heavy growth of beard at that time and was wearing a dark suit and without a hat. He thinks his beard was of about five days' growth and dark in color. He identified him as the man that shot Tulupan and at the request of police officers made a written statement. Defendant then said, "You are sure that I am the fellow that did the job?" and witness answered, "I saw you kill Paul Tulupan." He then said, "You know what that means to me, buddie." That is about all he said. He did not say to me, "You are a liar."

Miss Hulda Gold: She had lived at the Claridge Hotel about one year and a half prior to December 13, 1930. She knew Tulupan. She sat on the fourth stool from the door when he was killed. Paletz sat with her at the counter, to her right. Prior to that time she had known Paletz. She had been sitting there about fifteen or twenty minutes. She heard the shot. She sat almost parallel to the opening of the grill leading to the hotel lobby south of the grill. She did not see the person who shot Tulupan. She did not notice anybody near the front door when the shooting occurred. She could not identify the person who sat to the right of Paletz. When the shot was fired Paletz shouted, "Run!" She got up and ran out into the hotel lobby.

Carroll Johnson, a colored boy: Prior to December 13, 1930, defendant brought the hat (People's exhibit 3) into the place where witness was working, at No. 1247 North Clark street, in the city of Chicago, and left it to be cleaned and blocked. He brought the hat to witness on a Wednesday and on the following Saturday took it away. Witness did not then personally know defendant. The sweat-band in the hat was rotten and he sewed it to the hat with brown thread. He also put a new lining in the hat and pressed it and sewed it to the hat with brown thread. He was shown, and carefully examined, the hat in evidence (People's exhibit 3) and identified it as the hat he cleaned and blocked for defendant by his sewing of the sweat-band and of the new lining to the hat with brown thread, which he stated was his sewing. The next time witness saw that hat was about a week after defendant got it from witness and after Tulupan had been killed. He did not pay much attention to that date. The next time he saw defendant after he had gotten his hat from witness was about a month later at a police station, and he then identified him "absolutely" as the man who had left the hat with him to be cleaned and blocked. He also looked at four or five other persons at the police station for the purpose of ascertaining if any one

of them was the man who brought that hat to him. He had a good look at defendant for the same purpose.

· Jesse Leroy Smith: He knows defendant. He knew him prior to December 13, 1930. He gave the coat to defendant about October or November, 1930, that was marked for identification as People's exhibit 4.

David B. Lindstrom: He is a sergeant of the Chicago police department. It is his duty to examine exhibits for the purpose of determining finger-prints and to take photographs and make diagrams of the scenes of murders and accidents. On December 13, 1930, he examined at the Claridge grill two glasses, two cups, two saucers, two plates, one knife, a fork and a silver spoon for finger-prints. They were all on the counter of the grill, between the second and third stools in front of the counter when he examined them. He found two finger-prints on each one of the water glasses and found a finger-print and part of a finger-print on the spoon. He took the finger-prints of the deceased, Tulupan, of Evelyn Andrews and of defendant. None of the finger-prints that he found were the finger-prints of Evelyn Andrews. None of them were the finger-prints of defendant. He found the finger-prints of Tulupan on both of the glasses and on one of the glasses he found the finger-prints of another person. He has not been able to find out who that other person was. On the other glass he only found the finger-prints of Tulupan. The silver spoon is a very favorable article to show finger-prints. He was not able to determine the party who made the finger-prints on the silver spoon. There were no finger-prints on any of the other dishes or articles that he examined on the counter. He did not take the finger-prints of Paletz or of Miss Gold.

Only three witnesses were called to testify by defendant, all of whom had previously testified for the State: David B. Lindstrom, the finger-print expert, Jesse Leroy Smith, and Paul Mazeika, a police officer of Chicago. Some of the testimony of Lindstrom that was only given by him

when called by defendant is included in his testimony for the State. He further testified: Finger-print identifications are infallible, and by that he meant that the finger-prints of no two persons are alike, and that any person may be identified absolutely and correctly by his finger-prints. He stated that in the bureau of identification of Chicago there are approximately 350,000 charts or finger-prints of that many different persons and that no two of those finger-prints are alike. He explained very minutely how finger-prints were taken, developed and preserved. He further testified that he examined the shot-gun that was identified and offered in evidence by the State and which was later excluded by the court as incompetent evidence. He found no finger-prints on the shot-gun, and in answer to the question by defendant's counsel, "Assuming that the night it had been raining and snowing and that rain or snow got on the gun, would that have an effect?" His answer was, "It would obliterate them entirely," and that they would not be recognizable under the microscope. Mazeika testified that he was the police officer that arrested defendant at 18 West Ohio street and that he did not know him before that time. He saw for the first time, in the clothes closet where defendant was arrested, the overcoat heretofore admitted in evidence; that that was the first time he saw it and that he took that overcoat to the police station. Smith tesified that he gave the overcoat to defendant (People's exhibit 4); that after defendant was arrested the police officers came to see him about the hat that was found on defendant; that he told them he could identify the hat and the coat that he had given defendant; that they had the hat that he had given him, and that People's exhibit 3 is not the hat they presented to witness for examination. They showed him the right hat. He thinks it was locked up at that time.

There is at page 38 of the record a photograph that was made by the finger-print expert, Lindstrom, at 9:00 o'clock

P. M. of the day on which Tulupan was killed. It presents a good view of the six stools in front of the counter, of the counter and its contents, of the cash register and other articles behind the counter, of the east or front door of the grill, and of some tables in the grill. This photograph shows clearly that at the hour aforesaid there were no dishes in front of stools Nos. 1, 5 and 6 from the front of the grill that were used by persons dining in the grill at the time of the murder. It also shows that there was at the right of stool No. 2 from the front door a cup and saucer and a glass apparently full of water. It further shows that just to the right of stool No. 3 there was a cup and saucer and in front of the stool two dishes, or a dish or a bowl having apparently in it a spoon; that between that stool and the fourth stool was a folded newspaper, and that to the right, front and left of the fourth stool there were dishes, a water glass and other articles indicating that some person was at the time of the shooting occupying that stool and dining at the counter. The photograph and the other evidence in the record practically demonstrates that Paletz and Miss Gold occupied the third and fourth stools from the front of the grill and that the man who killed Tulupan occupied the second stool immediately to the right of Paletz, as he and Miss Gold testified, and that Mrs. Andrews erred in stating, in substance, that the man who shot Tulupan arose from stool No. 3 and stood between stools Nos. 2 and 3 and fired that shot. It was a very natural mistake for Mrs. Andrews to make, as no one could be expected to remember with absolute certainty which one of the six stools any diner on that evening occupied or that any diner could remember with such certainty on which stool he or she sat. It is of very great importance in this case, however, for several reasons, to ascertain with accuracy what stools Paletz and Miss Gold and the murderer did occupy at the counter on that evening. The glass full of water at the right of stool No. 2, together with the other evidence in the record,

tends to support the theory that the man who did the killing drank coffee and that he drank no water, and that it was his glass that only showed the finger-prints of Tulupan, and that the glass on his left was the glass used by Paletz, and that it had on it Tulupan's finger-prints and the finger-prints of some other person. The silver spoon that had a finger-print and a part of a finger-print of some unknown person was actually shown to be lying between Paletz and the murderer when he arose to shoot Tulupan. Spoons are usually placed by the waiters to the right of diners and water glasses to their right before the diners take their seats, and diners usually handle their glasses with their right hands when drinking from them, and a spoon in a bowl of soup, or other foods with which the diner serves himself by the use of a spoon, is usually in front of him. So the evidence tends strongly to show that the glass that had the finger-prints of two persons on it was not handled by the murderer and that the spoon was not handled by him.

The errors relied upon by defendant for a reversal of the judgment and sentence of the court are: (1) That the guilt of defendant is not proved beyond a reasonable doubt; (2) that the court unduly restricted the cross-examination of the State's witness Paletz and erroneously struck from the record certain testimony given by that witness on cross-examination; and (3) that the assistant State's attorney made improper arguments to the jury to which objections by defendant were overruled. We shall consider these alleged grounds for reversal in the order above set forth.

The contention of defendant that the evidence is insufficient to prove his guilt beyond a reasonable doubt cannot be sustained. We have set out substantially the entire evidence relied upon by the State to prove his guilt and also the evidence of defendant's witnesses, and it does not require extended discussion or argument to demonstrate that the man who shot and killed Tulupan was defendant. He was positively identified by the testimony of the witness

Paletz as the man who sat at his right on the evening of the killing and who fired the fatal shot, and his evidence is amply supported and corroborated by the other evidence in the case. The police officers who arrived at the scene of the murder within less than five minutes after it occurred, followed the foot-prints of defendant in the snow with un-erring certainty to the lawn where he dropped his hat, identified in the record as People's exhibit 3. That hat was again identified by the colored boy, Carroll Johnson, who testified for the People that he cleaned and blocked it for defendant shortly before Tulupan was killed, and absolutely identified defendant as the man who brought that hat to him to be blocked and cleaned. The man who dropped the hat as he was running away from the Claridge grill is without doubt the man who fired the shot-gun at Tulupan. Johnson recognized that hat as the hat he had cleaned and blocked for defendant by the new lining he had put in it and by the brown thread he had used in sewing it and by the sweat-band in the hat and by his customary method of doing such sewing. The testimony of Paletz and Johnson is also strongly corroborated by the testimony of Mrs. Evelyn Andrews, who had at least four good views of the man who killed Tulupan and talked with him during the course of his meal. She testified that the hat in evidence is exactly like the one worn by the man that fired the shot in the grill that night; that the overcoat worn by that man was exactly like the overcoat in evidence (People's exhibit 4) and which defendant admitted was his overcoat, and that as far as she "can remember, the defendant didn't look any different from the man who shot and killed Tulupan."

The evidence of all the aforesaid witnesses who testified for the People cannot be reasonably held to be overcome by the testimony of Jesse Leroy Smith for defendant, to the effect that the hat was not the hat he gave defendant; that the police officers at the police station showed him the hat he had given defendant, but that the hat they brought

to the trial and which was introduced in evidence by the People was not the hat the police showed him. He evidently got a better view of the hat at the trial and then concluded it was not the' hat the police showed him, because of the new lining sewed in the hat by Johnson. In the testimony of Lindstrom, the expert witness on finger-prints, we find a splendid dissertation on the art of making and developing finger-prints. His testimony shows clearly that he understands that business.. We also learn from his testimony that when finger-prints are made and properly developed they are a sure means of identifying persons. That is all the value or significance that can be given to his evidence in this case. His testimony is worthless as a means of our determining the guilt or innocence of defendant. This is so because of the fact that he did not take the finger-prints of Paletz. He only found finger-prints on two water glasses and on a silver spoon. The silver spoon contained the finger-prints of an unknown person, or rather of a person whose finger-prints he did not have or take. One of the water glasses, referred to in the record as "that glass No. 1," had two finger-prints on it, of which one were the finger-prints of Tulupan and the other were those of an unknown person or of a person not identified by Lindstrom. The other water glass which he examined, and which is referred to in the record as "glass No. 2," had on it only the finger-prints of Tulupan. This record does not reveal to us, and so far as we can ascertain it did not reveal to the jury, where Lindstrom found "that glass No. 1" or where he found the other glass referred to as "glass No. 2." It is absolutely proved in the record beyond a shadow of doubt that Paletz occupied stool No. 3 and that defendant occupied stool No. 2. It is just as certainly proved that one of the water glasses examined by Lindstrom was the glass used by Paletz on that night, and that the other glass he examined and on it found finger-prints was the glass to the right of or in front of defendant's stool, which was full of water

when Lindstrom photographed the counter and its contents. The record does not even reveal where Lindstrom found the silver spoon. The only legitimate guess that we can draw from the evidence in the record is that the unexplained finger-prints on the spoon and on the water glass were the finger-prints of Paletz, and that the water glass which was full of water and shown to be in front or to the right of stool No. 2 was not handled or used by defendant and was only handled by Tulupan. We refuse, however, to indulge in guessing what the evidence shows in a case of such seriousness and of such importance to both defendant and the State. It is inconceivable that the State's counsel allowed the record to come to this court in the condition that we find it, and that he did not see to it that the record should clearly show the location of both the water glasses and of the silver spoon, and that he did not in addition to that have the finger-prints of Paletz taken and introduced as evidence in this record so that it might definitely be determined whether or not he is the unknown person that made the finger-prints on water glass No. 1 and on the silver spoon.

Another very significant fact that tends strongly to show defendant's guilt is the fact that he did not deny Paletz's statement to him, "I saw you kill Paul Tulupan." Defendant's very significant reply to that statement of Paletz was, "You know what that means to me, buddie." Paletz further testified, in substance, that defendant did not in any manner deny that charge.

In cross-examining the witness Paletz, defendant's attorney asked why he did not, when examined by the coroner at the inquest, say that defendant, while in the restaurant, puffed cigarette smoke in his face, and that witness then stared at him for ten seconds or more in resentment of that act and that defendant stared at him during the same time. The witness replied that he was not asked about that. Defendant's attorney then asked the witness if at the coroner's inquest certain questions were not asked him to which he

made certain answers, the attorney reading the questions and answers, and the witness answered in the affirmative. An objection to the question was sustained and the court ordered the questions and answers stricken. The most substantial part of the testimony of the witness before the coroner, as shown by the questions and answers, was the following: "I entered the grill about 7:00 o'clock P. M. on the 13th day of December. I was seated about five minutes and I noticed the man next to me had ordered about three cups of coffee. I was reading a newspaper and commented on a little article to Miss Gold, who was sitting on my left. All of a sudden I noticed this man getting up to pay his check, presumably, and I heard a shot fired and I dropped to the floor, and I saw the man go out of the door." It was quite proper for the attorney for defendant to ask the witness why he had not mentioned in his testimony at the coroner's inquest the fact that his attention was particularly called to defendant by his blowing smoke in the witness' face. It was proper for the defense to bring out this fact on cross-examination and ask him about it. Great latitude should be allowed on cross-examination, especially in a capital case, and we cannot approve of the court's action in striking the question and answer of the witness about his testimony before the coroner's inquest. (*Ritzman* v. *People,* 110 Ill. 362.) There is, however, nothing in the record that indicates that there was any variance, so far as material and important facts are concerned, between the testimony of the witness on the trial and his testimony before the coroner's inquest. The record also shows that defendant's attorney was permitted to cross-examine this witness at considerable length, and we are satisfied that the striking of the question and answer and limiting the cross-examination concerning the testimony before the inquest could not have affected the result of the trial and affords no substantial ground for reversal of the judgment.

During the closing argument of the assistant State's attorney defendant's counsel interposed objections to several statements and remarks made in the argument, and these objections were overruled. It is contended that in these portions of the argument the assistant State's attorney did not confine himself to the evidence in the case, expressed his personal opinion that defendant was guilty and made inflammatory remarks. We have read all of the closing argument of the assistant State's attorney as well as the argument made for defendant. Some of the statements objected to by defendant's attorney were used properly in answer to the argument made for defendant. The assistant State's attorney did denounce defendant as a vicious criminal, but his argument was based on the facts shown by the evidence. In no part of the argument did the assistant State's attorney express a personal opinion as to the guilt of defendant based on knowledge outside of the record, but his argument was that the evidence showed defendant to be guilty, beyond all reasonable doubt, of a crime which should be punished by the extreme penalty. It is not improper for a State's attorney to reflect unfavorably on a defendant or to indulge in invective, within the limits of propriety, if based on evidence in the record. (*People* v. *Preston,* 341 Ill. 407.) The crime committed in the killing of Tulupan, as shown by the evidence in this case, was an atrocious and dastardly murder which called for a vigorous prosecution, and we would not be warranted in holding that there is anything in the closing argument of the assistant State's attorney that so transcended the bounds of propriety as to warrant a reversal of the judgment and sentence of the court. Defendant was ably defended. He has had a fair and impartial trial in which none of his substantial rights were denied him, and the verdict of the jury is well supported by the evidence.

The judgment of the court is affirmed. The clerk of this court is directed to enter an order fixing June 17, 1932,

as the date on which the original sentence entered in the criminal court of Cook county shall be executed. A certified copy of the order shall be furnished by the clerk of this court to the sheriff of Cook county.

*Judgment affirmed.*