THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BERNARD HELMS, Defendant-Appellant.

(No. 69-91;

Third District—July 30, 1971.

Theodore Gottfried, of Defender Project, of Ottawa, for appellant.

Henry D. Sintzenich II, State's Attorney, of Macomb, (Dennis K. Cashman, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE HUNT delivered the opinion of the court:

The Defendant, Bernard Helms, was indicted by the Grand Jury of McDonough County for the murder of his wife, Wanda. The cause was tried by a jury. At the close of the evidence for the prosecution, the Court directed a verdict on the charge of murder and the case was then concluded on the lesser included charge of involuntary manslaughter. The jury returned a verdict of guilty on the lesser charge. Defendant was

sentenced to the penitentiary for a term of not less than five nor more than eight years.

Defendant appeals to this Court challenging the sufficiency of the proof, the instructions by the Court, the testimony of a witness to an inculpatory statement and whether or not an indictment was still pending at the close of the case. Defendant also requests that his sentence be reduced.

The Defendant, his wife, Wanda, the deceased, and their children lived in a farm house near the town of Good Hope in McDonough County. Defendant's half sister, Matilda, was married to Ronnie Samson and they lived with their children at Route 3, Taylorville, Illinois. Ronnie had a drinking problem and tended to become violent when intoxicated. On previous occasions he had threatened Matilda with a knife, had placed a loaded shotgun across the baby bed and had threatened to kill them all. On occasion he had struck and abused his wife and she had had him jailed for such conduct. After one such quarrel, Matilda left Ronnie and brought the children to Defendant's home on July 7, 1969, where she sought shelter and protection.

The following Wednesday, July 10, Ronnie came to Defendant's home and asked to see his wife, Matilda. Ronnie was admitted to the house and his wife, upon seeing him, ran out the back door. Ronnie ran through the house and out the back door after her. Defendant feared for the safety of his sister and for the members of his family and obtained and loaded a .22 caliber pistol. He then went to the back door and seeing the couple in each others arms placed the loaded gun in a kitchen drawer.

The following day Defendant went to work, returning home about 4:00 P.M. The two families had an early dinner and Defendant, accompanied by his brother-in-law Ronnie, drove back to the Fleetwood Trailer Company about 5:30 P.M. to pick up Defendant's father who commuted with him but had worked overtime that day. After they picked up the father, William, they stopped at a grocery store and then at a tavern known as the Empire Club where they all drank beer. Ronnie testified that he drank more than the Defendant and that the Defendant had two or more bottles of beer at that tavern. The three men then went to the Tic-Toc Tavern where Ronnie and Bill had more to drink and Ronnie bought a half pint of hard liquor as they left. Bill left them at this point and Ronnie and Defendant returned to the house at about 8:00 P.M.

Enroute Ronnie said he had argued with his father-in-law about his mother-in-law and that he, Ronnie was going back to Taylorville yet that night. He said he was going to take Matilda and the children with

him. The testimony is conflicting as to whether he added, "or else" to this statement and if so, what he meant by it. Upon arriving at Defendant's house, Ronnie told Defendant to send Matilda out in the yard to talk with him. Defendant relayed this message and Matilda took her older child and went out to a swing set about 20 to 30 feet from the front door of the house to talk to Ronnie.

Defendant testified that he became apprehensive because Ronnie had been drinking and had made an earlier remark about taking his wife and kids home, "or else" and he had a half pint bottle of liquor with him. Therefore, Defendant went to the kitchen drawer and got the loaded gun. He returned to the living room where Wanda was seated in a deep upholstered chair just inside the front door. The rest of the children of the two families were sitting on the living room floor watching television.

Defendant opened a window near the door and chair so that he could hear any commotion outside which might occur between Ronnie and Matilda. He then sat down on the arm of the chair occupied by Wanda with his legs draped partly across hers. The loaded gun was in his right hand hanging at his side. What transpired thereafter was testified to only by the Defendant. Apparently the conversation between Defendant and Wanda concerned the relationship of Ronnie and Matilda and their domestic problems caused by his excessive drinking. Wanda commented about Defendant's drinking that night and told him if he continued he, too, would have to leave. Defendant replied, "If I have to leave, I'll go all the way," and raised the gun toward his head. Wanda reached for the gun or for the hand which held the gun and the gun discharged in some unexplained manner. The bullet entered the left breast, went through the heart and embedded itself in the rear of the chest cavity. Wanda slid down and forward in the chair and Defendant then realized she was hurt.

Defendant went immediately to the door and asked Ronnie and Matilda to come in and help him. They placed Wanda in the family car and Defendant rushed her to McDonough County Hospital at Macomb where she was pronounced dead. She was examined by the duty staff doctor, John L. Simmons, who noticed there were powder burns on the sweater and also around the hole in her breast. Upon completing his examination and determining that she was dead, he went out to the waiting room part of the emergency room and told Defendant she was dead and asked him what had happened. Over objection by counsel for Defendant, Dr. Simmons testified:

"Mr. Helms stated his brother-in-law was sometimes violent when he drank whiskey, so he procured a hand gun. I don't remember

whether it was a pistol or a revolver; and that after that there was an argument with his wife about his drinking. She told him he could leave and he threatened himself with the gun, saying he would leave permanently. There was a scuffle and his wife was shot."

The Defendant was the only eye witness to the shooting who testified. His version of the events leading up to the shooting were substantially as related above. He said he and his wife had no domestic quarrels and were not arguing just preceding the shooting. He then testified:

"I was sitting both on the chair and on Wanda's lap or on the arm because the arms on it is low. I was more or less sitting on her lap and on the arm too. I had the gun in my right hand. She was just sitting there talking, and kissing, and loving. I was acting a fool with her. We were talking about Ronnie being out there with the bottle drinking—of course, she was always kidding about me—and she said if I didn't quit my drinking I could leave too, because I had told her before Ronnie was planning on leaving that night. When she said this she was just joking. She never meant it because she didn't care about my drinking just as long as I didn't drink too much. I have never had a drinking problem. Well, after she said that, I said, 'Well, if I got to leave,' just joking around, 'if I have got to leave, I'll leave for good', and I was pulling the gun up toward myself. I wasn't serious when I said this. I was holding the gun in my right hand. I don't think I had my finger on the trigger. I think I was just holding the gun by this stock. The hand wasn't on the trigger. She hit my arm and I think she might have hit the gun. I don't know. The gun went off. She scooted down in the chair, and that is when I knew it had hit her."

Ronnie and Matilda Samson testified that they were sitting in the yard within 20 feet of the front door, that they heard no arguments or loud voices preceding the sound of the shot. These, and other members of the family, testified that Defendant and his wife were in love, were affectionate, seldom had any arguments and Defendant had never been known to drink to excess.

Based upon the above evidence, the jury found Defendant guilty of involuntary manslaughter.

■■ Defendant argues on appeal that there was not sufficient evidence of reckless misconduct to submit the case to a jury or to sustain a verdict. The evidence indicated Defendant had been drinking two or more beers in two taverns over a period in excess of two hours; that he held a loaded hand gun in the proximity of his wife; that during a conversation con-

cerning his drinking he pointed the gun at himself; that she attempted to deflect it or take it away from him and they scuffled for it; that it discharged at point blank range into her chest and that within an hour after the event, he made a voluntary statement to the examining physician that he and his wife were scuffling for the gun. Defendant presented extensive evidence of his love for his wife and absence of domestic quarrels and the joking and playfulness that surrounded the shooting incident in support of his theory of misadventure. The fact that the only eye witness to the event, the Defendant, testifies concerning a misadventure does not require an acquittal. *People v. Uher* (1940), 375 Ill. 499; 31 N.E.2d, 936.

■■ The self interest of the Defendant as a witness is obvious. His supporting witnesses were all related by blood or marriage. The jury was properly instructed concerning their responsibility to weigh the evidence and to determine the credibility of the witnesses. This Court cannot say, as a matter of law, that Defendant's acts did not constitute reckless misconduct as defined by the criminal code. *People v. Bolger*, 359 Ill. 58; 194 N.E. 225.

Defendant complains he was refused an instruction on excusable homicide—a death by misadventure. Defendant's instruction number 2 reads as follows:

> "The Court instructs the jury that if you believe from the evidence in this case that the defendant was engaged in a lawful act *without any intention of killing anyone,* but unfortunately by misadventure, and without culpable negligence, killed Wanda Helms, the deceased, at the time and place charged in the indictment, the killing would be excusable homicide and your verdict should be not guilty." (Emphasis supplied.)

This tendered instruction is not from IPI Criminal Instructions. There is nothing in the record to indicate a discussion of the tendered instruction or any objection thereto by the People. The record merely shows a statement by the Court, "Instruction Number 1 refused, Number 2 refused."

■■ The tendered instruction cites as its authority *People v. Venckus* (1917), 278 Ill. 124; 115 N.E. 880. In that case a somewhat similar instruction was tendered and was refused by the trial court, the Supreme Court affirmed. In 1917 the Criminal Code, Section 290 defined excusable homicide as a killing "where it satisfactorily appears there was no evil design or intention, or culpable negligence". There is no definition of excusable homicide in the present Criminal Code nor is there an IPI Criminal Instruction on the subject. The Supreme Court in *Venckus* defines the term as follows:

"Homicide by misadventure, and for which an accused may be excused or acquitted, is the accidental killing of another where the slayer is doing a lawful act, unaccompanied by any criminally or reckless conduct."

The tendered instruction did not conform to this definition. A comparable instruction was criticized in *People v. Johnson* (1968), 100 Ill.App.2d 13, 241 N.E.2d 584. The Court observed that while *People v. Lefler* (1967), 38 Ill.2d 216, 230 N.E.2d 827 required an instruction to the effect that "if the deceased met her death by misadventure without any conscious disregard by the Defendant for her safety, the jury should find the Defendant not guilty" that "conscious disregard for safety" was not analogous to "without any intention of killing anyone."

The jury was instructed in the language of the statute as to the definition of involuntary manslaughter and IPI Instruction 5.01 was given defining the word "recklessly". The issues instruction, IPI 7.08, required the jury to find beyond a reasonable doubt that Defendant performed the acts recklessly. Reckless conduct excludes misadventure or inadvertence. The jury was adequately instructed on this subject and the Court did not err in refusing the tendered instruction number 2.

Defendant also complains that his tendered instruction number 1 concerning circumstantial evidence was improperly refused. IPI Criminal Instruction 3.02 was given which properly explained circumstantial evidence. The purpose of the IPI instructions as set forth by the authors was to create a series of new instructions, unslanted in favor of either the prosecution or the defense. While IPI Criminal Instructions are not to be considered totally exclusive, these instructions are to be used by the trial courts where applicable and where they are clear and concise, no further instructions are needed. The trial court did not err in refusing Defendant's tendered Instruction Number 1.

Defendant claims error in admitting the testimony of Dr. John L. Simmons, the examining physician. This testimony included a question by the doctor after he had advised Defendant that Wanda was dead, about the origin of the powder burns on the sweater and body of the deceased. The witness then quoted Defendant as saying that he and his wife had scuffled for the gun and it went off. Defendant objected to this testimony at the trial on grounds that this statement constituted an oral confession and that the witness's name had not been included in a list of witnesses to oral confessions received by Defendant, and the Defendant was taken by surprise at the trial. The statement was not made to a police officer in a *Miranda* situation and does not constitute a confession of all of the elements of the crime of involuntary manslaughter. The witness's name did appear on a list of witnesses who did testify at the

trial. The incriminating nature of the witness's testimony was made known to Defendant before the witness took the stand and a hearing was held out of the presence of the jury concerning the voluntary aspects of the statement. The trial court properly admitted the evidence. *People v. Ford,* (1968), 39 Ill.2d 318, 235 N.E.2d 576; *People v. Georgev* (1967), 38 Ill.2d 165, 230 N.E.2d 851.

■■ Defendant also contends that the action of the trial court in directing a verdict for the Defendant on the charge of murder at the close of the People's case disposed of all of the issues framed by the one count indictment, and that the lesser included charge of voluntary manslaughter was not preserved. Defendant also claims surprise in that his preparation of a defense to a charge of reckless misconduct might have been different than a charge of willful misconduct. The Defendant was furnished with a copy of the indictment well in advance of the trial and was aware of the lesser included offenses contained therein. The jury was adequately instructed by the Court and should not have been confused. Defendant was not prejudiced by this procedure. Convictions of manslaughter under murder indictments are common. *People v. Turner* (1944), 385 Ill. 344, 52 N.E.2d 712; *People v. Johnson,* 54 Ill.App.2d 27, 203 N.E.2d 283.

During the pendency of the appeal, the Appellant was granted leave to amend his brief to request a reduction of sentence pursuant to Supreme Court Rule 362. Appellant was sentenced to a term of five to eight years. He had no previous criminal record, was steadily employed and supported his family. All the testimony at the trial showed Appellant to be mild mannered, industrious and making a worthwhile contribution to the community in which he lived. Had it not been for a few reckless moments, this tragedy would not have happened and his name would probably never have come to the attention of the authorities.

The new Illinois Constitution provides in its Bill of Rights that "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Illinois Constitution, Article I, Section 11, (effective July 1, 1971).

■■ In *People v. Brown,* 60 Ill.App.2d 447, the Court considered at length the purposes of the sentencing process. It was said that this process should provide adequate punishment for the offense committed, the safeguarding of society from future offenses, and the rehabilitation of the offender into a useful member of society. Adequacy of the punishment should determine the minimum sentence with the maximum dependent upon the court's divination as to the length of time required to achieve rehabilitation. See also *People v. Lilly,* 79 Ill.App.2d 174 and 178, and *People v. Moore,* 133 Ill.App.2d 827.

With this in mind, we regard this case appropriate for the imposition of a minimum sentence of two years and a maximum sentence of six years. This conclusion is based primarily on the factors that the Defendant had no prior record, maintained his family life, was steadily and gainfully employed, and exhibited positive interest in the community.

■■ Accordingly, the judgment and sentence of the Circuit Court of McDonough County are modified to provide that the sentence imposed on Defendant be confinement in the penitentiary for a term of not less than two nor more than six years and as so modified, the judgment is affirmed.

Judgment modified and as modified, affirmed.

ALLOY, P. J., and STOUDER, J., concur.