THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANTONIO DeHoyos, Defendant-Appellant.

(No. 60188;

First District (3rd Division)—July 3, 1975.

14

Paul Bradley and Lynn S. Frackman, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Donald M. Devlin, Assistant State's Attorneys, and Larry L. Thompson, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

The defendant, Antonio DeHoyos, was indicted for the murder of Jose Pallares, and a jury found him guilty of involuntary manslaughter (Ill. Rev. Stat. 1971, ch. 38, pars. 9—1, 9—1(a-2), 9—3(a)). The court sentenced defendant to serve a term of 3 to 9 years in the State penitentiary. Defendant appeals. We reverse and remand for a new trial.

The deceased, Jose Pallares, died of a gunshot wound in his head on September 20, 1972. He had arrived at the home of his aunt, Mary Sanchez, at approximately 10 p.m., on September 19, 1972. Four hours later the defendant arrived, carrying a pistol in a brown paper bag. Ricardo Sanchez, Pallares, and the defendant sat on a couch in the living room, where three younger brothers of Ricardo were asleep on the floor. Their mother, Mary Sanchez, was asleep in a bedroom. James Sanchez, after allowing defendant to enter the apartment, went into another room to watch television.

Ricardo Sanchez testified that he saw the defendant take a pistol from the brown bag he was carrying. While sitting on the couch with Pallares and Sanchez, the defendant removed three cartridges from the weapon, replaced one in the chamber, spun it and put the gun to his head and "clicked it." The gun did not fire. He then pointed it at Ricardo who jumped off the couch and told the defendant not to "fool around." The defendant then pointed the gun at Pallares. Sanchez pulled a blanket over his head and heard the gun "click twice." As he was pulling the blanket off he heard the third click and a gunshot. With the blanket still over his eyes he saw a "flash," and when he pulled the blanket completely off his head he saw the defendant with the gun in his hand. Sanchez was standing 2 or 3 feet from the couch at the time the shot was fired. He testified that he never saw anyone other than the defendant holding the gun that evening.

Mary Sanchez testified that when she heard the gunshot she rushed into the living room and saw the deceased on the floor and the gun in the defendant's hand. She stated that Ricardo Sanchez and the defendant said the deceased had shot himself. When the defendant announced that he was going to leave, she told him to wait for the police. He said the gun was not his but belonged to the government, and told her to

tell the police that the deceased was shot through the window. He then left the building.

The defendant testified that he had purchased the weapon a few days before the incident to protect his mother and that he carried it with him at all times. He stated that after he arrived at the apartment, Pallares asked to see the contents of the bag, and he handed the pistol to him. Sanchez got up from the couch and stood by the television set. Pallares began to pull the hammer of the pistol back and let it go. The defendant told him not to play with the gun, and he grabbed the gun, first with one hand, then both hands, in an attempt to take it away from Pallares. The gun discharged, hitting Pallares. Defendant stated that he could not remember telling Mrs. Sanchez to tell the police the deceased was shot through the window, but admitted that it was possible he had said it.

The defendant further testified at trial that after leaving the Sanchez apartment he threw the gun into a nearby vacant lot. He returned soon afterwards, retrieved the gun and took it to the home of Richard Bondie where he left it. As he and Bondie left the house they were approached by police and defendant fled, going to his sister's home, then to the home of Frank Rogers where he stayed until his arrest.

Defendant testified that Ricardo Sanchez was in the living room at the time of the shooting but he did not know what Sanchez had witnessed. He explained that he threw the gun inside a "knocked-down house" in a prairie, retrieved it and took it to Bondie's home. On cross-examination, the prosecution sought to impeach defendant's testimony on that point by reading into the record the testimony at the preliminary hearing where defendant testified that he threw the gun into a knocked-down house, but made no mention of retrieving it and taking it to Bondie's home. The preliminary hearing was held before the gun was brought to the police by Bondie's mother.

Richard Bondie testified that defendant had come to his house soon after the incident and told him that he and Pallares were pulling on his gun and it accidentally fired. Bondie volunteered to hide the weapon. It was later found by Bondie's mother and she surrendered it to the investigating officer on October 22, 1972.

At the trial Ricardo Sanchez denied telling his mother that Pallares had shot himself. He admitted that on the evening of the incident he made an unsworn statement to the police in which he stated that he had been in the bathroom and heard the shot as he came out. He testified that the prior statement was not true, and that he had lied because he feared possible reprisals by defendant's friends. He further

testified that after the weapon discharged he heard defendant say "I didn't know it was going off."

The defense rested, and the prosecution called in rebuttal a firearms identification technician employed by the Chicago Police Department, who testified that he had examined and tested the weapon and bullet involved in the case. He stated that the gun had a double-action pull (pulling the trigger to activate the hammer) of 9½ pounds and a single-action pull (pulling the trigger when the hammer had already been cocked) of 3½ pounds. The pull here was greater on this firearm (a .38-calibre Smith & Wesson military police model revolver) than on a target pistol. He further stated that the gun could not be fired without the trigger being pulled, and if an individual had both hands wrapped tightly around the cylinder the gun could not be fired.

An investigating police officer testified for the prosecution on rebuttal that he had examined the body of the deceased at South Chicago Hospital and found no powder burns on it. He acknowledged, however, that either the body or the wound could have been washed prior to his inspection.

During the prosecution's rebuttal the defense was permitted to reopen its case for the limited purpose of securing the testimony of Augustine Sanchez, brother of Ricardo. Augustine testified that he was asleep on the living room floor; that he heard the shot and, having awakened, saw the gun lying on the end table. The defendant was standing near a dresser and said the deceased had shot himself. The witness further testified that he heard his brother Ricardo state that he was in the bathroom at the time the gun discharged.

The defense attempted to introduce into evidence the statement made by Ricardo on the evening of the shooting. The court, stating that it had allowed the defense to reopen its case for the limited purpose previously described, denied the defense's motion.

The last witness in rebuttal for the prosecution was Frank Rogers. He testified that the defendant stayed at his house after the shooting. However, he denied knowing that defendant was there and denied speaking to defendant's mother when defendant was there. Rogers was asked if he had ever been convicted of a crime, and over objection by defense counsel, responded that he had been convicted for the sale of narcotics and had served the entire sentence of 10 years and 1 day. During the defense testimony defendant testified that he was permitted to stay at Rogers' house from September 20 to September 22, 1972, the date he was arrested. His mother also testified that he was at Rogers' house during that time and had spoken to Rogers on the evening of September 20.

■■ We first direct our attention to the issue of the propriety of the State's direct examination of its rebuttal witness and the testimony of that witness that he had been convicted of a felony and had served time in the penitentiary. As stated in *People v. Karmazinas* (1967), 80 Ill. App.2d 322, 324, 224 N.E,2d 287, rebuttal evidence is that which is produced by a party to explain, repel, contradict or disprove the evidence given by the opposing party to a lawsuit. (See also *People v. Bell* (1927), 328 Ill. 446, 451, 159 N.E. 807; and *People v. Carbona* (1975), 27 Ill.App.3d 988, 327 N.E.2d 546.)

In the instant case it appears that the prosecution called Frank Rogers to the stand to rebut or disprove the testimony of defendant and his mother. Defendant vigorously argues that the sole purpose of the State in eliciting from Rogers his testimony as to his prior conviction was to implant in the minds of the jurors the guilt of defendant by showing his association with Rogers. In light of Rogers' other testimony we cannot agree with defendant that the primary or singular object of Rogers' testimony was to establish in the jurors' minds the defendant's guilt by association. On the other hand, we cannot condone the prejudicial result of this testimony.

In the early decision in *Rockwood v. Poundstone* (1865), 38 Ill. 199, 201, the general rule concerning the impeachment of one's own witness was stated:

> "A party may not discredit his own witness by general evidence, the meaning of which is, that a party after producing and examining a witness, can not prove him to be of such a general bad character as would render him unworthy of credit."

In *People v. Wesley* (1959), 18 Ill.2d 138, 150-151, 163 N.E.2d 500, our supreme court reiterated the rule that a party who calls a witness to testify cannot directly impeach his testimony, but observed that certain exceptions to the rule indicate that it may be in the process of erosion. A party calling a witness, upon being surprised by his testimony, may request the court to call him as a court's witness and proceed to examine him as though on cross-examination. (See *People v. Wesley; People v. Marino* (1968), 95 Ill.App.2d 369, 238 N.E.2d 245.) A witness may be cross-examined if the court determines that he is hostile or unwilling. (Ill. Rev. Stat. 1973, ch. 110A, par. 238.) However, the *cross-examination* of witnesses as to prior convictions has been limited to instances when the witnesses' credibility is in issue. See *People v. Montgomery* (1971), 47 Ill.2d 510, 268 N.E.2d 695; *People v. Moses* (1957), 11 Ill.2d 84, 142 N.E.2d 1; *People v. Halkens* (1944), 386 Ill. 167, 53 N.E.2d 923.

In our review of the applicable case law we find no decision except

that in *United States v. Chamley* (7th Cir. 1967), 376 F.2d 57, where the prosecution or other party has been permitted on *direct examination of its own witness* to elicit testimony as to the prior conviction of the witness. In *Chamley* the prosecution's witnesses—who were coconspirators—were permitted to testify as to their prior convictions. The court, in finding no error in the procedure, observed that the defense had made no objections to the statements and that defense counsel invited such testimony by referring to the witnesses in his opening statement as convicted felons. The court further stated that the criminal records of the witnesses were relevant and the fact of their convictions should not be left to defendant's strategy. The facts in *Chamley* are distinguishable. In the instant case defense counsel immediately interposed an objection to Rogers' admission to a prior conviction. Here there was no showing that the prosecution was surprised or that the witness was hostile or unwilling to testify. The prosecution, through its own witness—an admitted friend of the defendant—summarily advised the jury that Rogers was a convicted felon.

■■ It is our opinion that the prosecution improperly examined the witness as to his prior conviction. The trial court erred in allowing the prosecution to thereby impeach Rogers. (See *People v. Marino.*) We find no relevancy to this portion of the State's inquiry. The resultant prejudice to defendant necessitates a remand of the case for a new trial. It is necessary for us to briefly comment on certain other issues which have been raised and which are likely to arise upon a retrial.

■■ Defendant contends that the prosecution improperly sought to impeach his testimony by producing on cross-examination his prior inconsistent statement upon an irrelevant and collateral matter. We disagree. A defendant who takes the stand and testifies puts his credibility in issue and is subject to the same tests as other witnesses. (*People v. April* (1968), 97 Ill.App.2d 1, 239 N.E.2d 285.) Matters which are clearly collateral and immaterial are not subject to impeachment by proof of prior inconsistent statements. (*People v. Partee* (1974), 17 Ill.App.3d 166, 308 N.E.2d 18.) At the trial, defendant testified on direct examination that he threw the gun into a yard, retrieved it and took it to Bondie's home. Prior to that, at a preliminary hearing, defendant stated that he threw the gun into a yard next to a tavern, without relating its retrieval and subsequent delivery to Bondie. Defendant's testimony as to disposing of the gun was relevant and material. It was proper, for purposes of impeachment, to inquire as to the omission in his previous testimony. (*People v. Bonham* (1932), 348 Ill. 575, 181 N.E. 422.) Testimony given by a witness upon oath in court, subject to cross-examination, is to be considered as substantive evidence, and a prior inconsistent

statement may be received for the purpose of impeaching the credibility of the witness. *People v. Coleman* (1974), 17 Ill.App.3d 421, 308 N.E. 2d 364.

Defendant next contends that the trial court erred in refusing an instruction in support of his theory of accidental death. The instruction (not an Illinois Pattern Instruction—Criminal) provides:

> "The burden is on the prosecution to establish the guilt of the accused by legal and competent evidence beyond a reasonable doubt. If the death of Jose Reyes Pollares [*sic*] was the result of a lawful act done by the accused in a lawful manner, such accidental act renders the homicide excusable. Consequently, unless you are satisfied beyond a reasonable doubt that the homicide, if any, was not the result of an accident, you must acquit the accused."

Defendant's reliance on *People v. Lefler* (1967), 38 Ill.2d 216, 230 N.E.2d 827, is misplaced. *Lefler* was decided prior to January 1, 1969, the effective date of Supreme Court Rule 451 (Ill. Rev. Stat. 1973, ch. 110A, par. 451). Paragraph (a) of Rule 451 provides, *inter alia,* that Illinois Pattern Instructions in Criminal Cases (IPI-Criminal) shall be used, and "[w]henever IPI-Criminal does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument." In the case before us the instruction tendered is not free from argument. Furthermore, it requires the State to prove beyond a reasonable doubt that the death was not the result of an accident. The instruction does not properly state the law and was properly refused. (*People v. Carbona.*) Several recent decisions since *Lefler* establish that where the jury has been adequately instructed as to the issues and definitions of the offense charged, no error results from the refusal to give a tendered instruction on accident or misadventure. (See *People v. Routt* (1968), 100 Ill.App.2d 388, 241 N.E.2d 206; *People v. Helms* (1971), 133 Ill.App.2d 727, 272 N.E.2d 228; and *People v. Puckett* (1972), 6 Ill.App.3d 206, 285 N.E.2d 258.) In *People v. Carlton* (1975), 26 Ill.App.3d 995, 999, 326 N.E.2d 100, this court stated: "An act that is committed accidentally does not involve a mental state cognizable to the criminal offenses of murder and involuntary manslaughter." However, the jury must find that the defendant possessed the required mental state for the offense charged before he can be found guilty. The instructions given in the instant case adequately informed the jurors of the mental state necessary before the defendant could be found guilty of either offense. *People v. Carlton.*

Defendant further contends that the trial court erred in refusing his

20

tendered instruction which stated if two conclusions of equal weight can be drawn from the testimony, the jury is required to adopt the one favoring the innocence of the defendant. We disagree. The foregoing is commonly known as the "innocent hypothesis," and is not an IPI-Criminal instruction. In *People v. Lefler*, the supreme court held that the trial court should instruct the jury to adopt the hypothesis as to the factual occurrence which favors the innocence of the defendant where opposing theories as to guilt or innocence can arise out of the same facts. Following *Lefler*, we have recently held that such instruction is applicable where the opposing theories arise out of the *same facts*. (*People v. Decker* (1974), 19 Ill.App.3d 86, 311 N.E.2d 228; see also *People v. Mead* (1972), 3 Ill.App.3d 565, 278 N.E.2d 15.) However, the facts in the instant case are significantly different from those in the cases cited and require our holding that the trial court properly refused the tendered instruction. (*People v. Stanley* (1974), 21 Ill.App.3d 188, 315 N.E.2d 106.) Here, the testimony was contradictory—*not the same facts*—as to what actually transpired in the Sanchez apartment on the fateful evening, and the instruction was properly refused.

For the reasons stated, the judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial in accordance with the views set forth in this opinion.

Reversed and remanded.

McGLOON, P. J., and McNAMARA, J., concur.