(No. 29514.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PETER BOULAHANIS, Plaintiff in Error.

*Opinion filed May 21, 1946—Rehearing denied September 16, 1946.*

ROLAND VICTOR LIBONATI, of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and WILLIAM J. TUOHY, State's Attorney, of Chicago, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and JAMES BROWN, all of Chicago, of counsel,) for the People.

Mr. JUSTICE GUNN delivered the opinion of the court:

Plaintiff in error, Peter Boulahanis, (hereafter referred to as the defendant,) was indicted in the criminal court of Cook county, and convicted of the crime of murder, and sentenced to the penitentiary for a term of fourteen years.

A proper determination of the errors assigned requires a rather full statement of the facts in the case. The evidence introduced by the People shows the deceased, Mike Dooman, was killed about 5:30 A.M., January 1, 1945, in Johnson's Cocktail Lounge, located at No. 938 Belmont avenue, in the city of Chicago. The facts stipulated as to his occupation were that he was a black-market operator engaged in the illicit sale of gasoline, and had coupons for something over six million gallons of gasoline in his possession. Dooman had been in and out of the tavern all night. He arrived in company with a man by the name of Kenneth Jolgren, and went to the north end of the bar

and deposited two revolvers back under it. About 5:30 a man came into the saloon, (some of the witnesses say two men,) and walked towards the north end of the bar, and shot the deceased several times, and then backed out of the door and drove away.

The evidence also shows that about a half hour before the shooting the deceased and Jolgren had driven in an automobile to a tavern at No. 609 North Clark street, owned by brothers of the defendant, and stepped into the doorway of the tavern and fired their revolvers indiscriminately, shooting up the place, and then jumped into their automobile and drove to the Johnson bar, some four or five miles distant. There were more than twenty customers in the bar at the time of the killing, none of whom testified as witnesses in the case. The only witness who gave a positive detailed statement of the facts was the witness Jolgren, the companion of Dooman in the shooting up of the Clark street place, who says another man accompanied the killer. Carl Johnson, the owner of the lounge, and his bartender, Andrew Fausk, both testified that after the first shot was fired they dropped behind the bar, and were unable to identify the assailant of the deceased. June Chapman, the "twenty-six" dice girl, first failed to identify the defendant, but under circumstances discussed later, finally did identify him. Her companion, John Patrick Henry, a marine on furlough, identified the defendant as the one who had fired the shot, but on cross-examination admitted that when he was lined up with his five or six brothers they all looked alike.

The defendant positively denied he knew the deceased, or that he shot him, or was present at the place of the homicide, or that he had any interest in the tavern on Clark street that was shot up, and produced four or five members of his family testifying to a complete alibi. Aside from being related to the brothers who owned the saloon, no motive is shown for the defendant killing the deceased.

And most singular of all, it is claimed the man who fired the fatal shot was accompanied by a companion, but not a single witness identifies or describes the companion of the assailant.

The errors assigned are failure to properly instruct the jury, and the action of the court in improperly allowing June Chapman and Irene Benton to be called as court witnesses and cross-examined by the State's Attorney; and that the evidence was insufficient to show the guilt of the defendant beyond a reasonable doubt.

We have examined the instructions upon alibi and are satisfied the court accurately instructed the jury in this regard. Although the court refused some instructions offered by the defendant, the matter contained in them was either covered by the instructions given by the State, or singled out certain facts rendering them objectionable.

The chief errors grow out of the conduct of the trial. June Chapman was the "twenty-six" girl, operating some sort of a dice game, and was talking with John Patrick Henry. This witness was called by the State's Attorney; she was present in the tavern when the killing occurred, and could have seen the homicide. Upon direct examination she testified she was unable to identity the plaintiff in error as being in the tavern at the time of the killing. The State's Attorney immediately stated he was surprised, and made the necessary showing to qualify this woman as a court's witness, and asked that she be called and examined by the court, and thereby permit both the prosecution and the defendant to cross-examine her. We have many times passed upon the right of the court in its discretion to allow a witness to be called by the court, so as to subject her to cross-examination by both sides. The purpose is to advance justice. In this case the State properly made the necessary showing, as we have decided in many cases. *People* v. *Cleminson,* 250 Ill. 135; *People* v. *Baskin,* 254 Ill. 509; *People* v. *Michaels,* 335 Ill. 590; *People* v. *Johnson,*

333 Ill. 469; *People* v. *Daniels,* 354 Ill. 600; *People* v. *Grigsby,* 357 Ill. 141; *People* v. *Peterson,* 364 Ill. 80.

The fact that under certain circumstances a witness may be called by the court and cross-examined by both sides does not mean every witness may be so called, or that the cross-examination may include everything that may affect credibility. The purpose of permitting such procedure is to refresh recollection, or to awaken conscience. Some unnecessary comments were made by the assistant State's Attorney and by the court during the witness's examination, but these could not be harmful because her statements were so contradictory as to render her testimony worthless. The cross-examination did have the effect of destroying her first statement that she could not identify the man she saw during the shooting, by her admission she had stated otherwise to the State's Attorney.

There were, however, some things about the cross-examination of this witness by the State's Attorney which were highly improper. During the time she was on the witness stand court adjourned until the next day. After the adjournment she was taken to the office of the State's Attorney and interrogated by the trial assistant and by Crowley, another assistant State's Attorney. The next day, as a part of the cross-examination as a court witness, the court allowed the conversation between this witness and these two assistant State's Attorneys to be admitted. This conversation included a question as to whether she had been paid to change her story, and if she was scared, and then by interrogation she was required to detail the conversation had with assistant Crowley. She had been under what was called the protective custody of the State's Attorney's office, and had previously testified she would "tell them anything they wanted me to say," if she were released.

While, under the rule referred to above, any statements made immediately after the crime contrary to those made on the witness stand would have been permitted, we have

been cited no authority holding it proper to allow the questions and answers of the witness in the office of the State's Attorney, out of the presence of the court and the defendant and not pertaining to events connected with the homicide, to be introduced. The proceeding was highly irregular and injurious to the defendant. These questions gave an unreliable witness, under the prompting of the attorney for the prosecution, an opportunity to make the impression she was both paid and frightened by the defendant. This was emphasized by the questions of the State's Attorney as to the witness requesting protection of the police after the homicide.

The error of such examination has been pointed out several times by this court. In *People* v. *Krejewski,* 332 Ill. 120, we said: "While the State had a right to submit a witness, called by the court as a court witness at the request of the State, to a most rigid and searching cross-examination, it was not competent for the State, under guise of the impeachment of such witness, for whose veracity the defendants had not vouched and for whose statements made out of court they were in nowise responsible, to introduce hearsay statements, made out of the presence of the defendants, that the witness had identified the defendants as the persons who committed the robbery. The ordinary juror hearing such evidence would be most likely to consider it as substantive evidence of the guilt of the defendants."

In *People* v. *Johnson,* 333 Ill. 469, where a person was called as a court's witness, the State's Attorney was permitted to ask if such witness had not in the presence of four persons made a certain statement, which she denied. The question asked was immaterial. The four persons named were permitted to testify she did make such a statement, and in holding this error we said: "thus the prosecution was enabled to present to the jury evidence of her unsworn statement that she had bought a radio from

the plaintiff in error. The only object of having her called as a witness was not to get the testimony which she was expected to give, but to get before the jury her unsworn statement which it was intended to offer under the guise of impeachment. Having been admitted by the court as evidence in the case, it was certain to be regarded by the jury as evidence of the fact of purchase, though it had in law no effect for that purpose. * * * It was error for the court to call her as a court witness, to permit the impeaching question to be put to her on cross-examination, and to permit the impeaching witnesses to testify contradicting her answers."

In *People* v. *Rotello,* 339 Ill. 448, wherein like procedure was followed, we said: "It is not proper for the court to call as a court's witness, at the request of the prosecution, a person who denies all knowledge of the commission of the crime, and then permit the State's Attorney to ask the witness on cross-examination if he had not previously· made statements contradictory of his testimony, thus laying the foundation for impeachment, and, after the witness' denial of making such statements, to impeach him by witnesses who testify to his making the statements, thus getting before the jury a prejudicial, unsworn statement, not subject to cross-examination by the defendant, pure hearsay."

It is apparent, without comment, that the statements made in the office of the State's Attorney regarding this witness being scared, and being bought, were wholly outside of cross-examination, immaterial and prejudicial.

Another occurrence, equally irregular, was with respect to the witness Irene Benton. The defense had closed its case. In addition to a complete denial by defendant, witnesses were produced to establish an alibi. Irene Benton was called by the State in rebuttal, and the court was asked to interrogate her as a court's witness for the following reason: "I am asking the Court to allow the State to

show the jury under what circumstances this girl is testifying, and what interest she may have in the case, or in the outcome of·this case, and how closely she is associated with these people, and whether or not it may have been her association with them which caused her to change her statements, which were made in the presence of Chief of Detectives Storms, and a court reporter, on January 11, to those she now makes today, under oath." The statements to which the State's Attorney refers were at a supposed meeting between the defendant and one of his brothers, at a place not the scene of the homicide. The court allowed this to be done, and asked one question, *viz.,*— "On the morning of January 1, 1945, that would be New Year's morning, did you see Peter Boulahanis, the defendant in this case?" A. "I did not." Based on this question and answer she was exhaustively cross-examined as to what took place between her and the defendant and the defendant's brothers, at a place several miles distant from the place of the homicide.

In the first place, Irene Benton was not an eyewitness nor present in the tavern where she could have been an eyewitness. She was not qualified to be called as a court's witness. (*People* v. *Cleminson,* 250 Ill. 135; *People* v. *Johnson,* 333 Ill. 469; *People* v. *Rotello,* 339 Ill. 448.) The matter concerning which she was interrogated affected her testimony. By this method of cross-examination, the State's Attorney was permitted to ask her questions which, if answered in the affirmative, would have impeached her. The witness, however, denied all of the questions put to her on cross-examination, and, under the familiar rules, the State was concluded by such answer. (*People* v. *O'Gara,* 271 Ill. 138.) Not only the calling of this witness but the cross-examination was irregular, and constituted error.

In addition to the foregoing, when different members of his family were called to establish an alibi for the defendant, the assistant State's Attorney asked each of them

on cross-examination if they had not been subpoenaed before the grand jury, and if they had not refused to answer questions propounded to them by the grand jury. Nothing more was asked them. The only purpose of such a question would be to impeach the witness. The general method of impeaching a witness is to prove his reputation is bad. (*Addison* v. *People,* 193 Ill. 405.) The fact such witnesses had refused to answer questions before the grand jury is not necessarily impeaching. They may have been called as defendants, or they may have had proper constitutional reasons for refusing to answer.

The saloon that was shot up belonged to the brothers of the defendant. Some of the brothers were before the grand jury. The mere showing that they refused to answer does not impeach them, because it is not necessarily inconsistent with their testimony. Moreover, in order to impeach a witness not a party it is necessary that a foundation be laid by propounding to the witness the statement he is supposed to have made contrary to his testimony. (*Campbell* v. *Campbell,* 138 Ill. 612; *Chicago City Railway Co.* v. *McLaughlin,* 146 Ill. 353; *Larrance* v. *People,* 222 Ill. 155.) A witness can never be impeached upon an immaterial matter, and it was immaterial to the truth or falsity of their statement concerning an alibi whether they had refused to answer questions, unless the particular question of an alibi had been propounded to them before the grand jury. *People* v. *Cappalla,* 324 Ill. 11; *People* v. *Decker,* 310 Ill. 234; *People* v. *Pfanschmidt,* 262 Ill. 411.

While the State claims the defendant's guilt was established beyond all reasonable doubt, the case appears to us to be a close one. We think it highly singular that the man who was supposed to have accompanied the killer has never been identified nor even mentioned, as obviously he was equally guilty with the man who fired the shot. Likewise, no explanation is offered for the failure to call any

of the more than twenty patrons present. No motive has been shown for the defendant to seek out and kill the deceased. His brothers might have had a motive, but the evidence shows no motive for the defendant. The witness June Chapman was wholly unreliable, and the testimony of the alibi witnesses, with the complete denial by the defendant of any knowledge of or participation in the crime, required that the conduct of the trial be fair, and that the defendant be not prejudiced by the introduction of improper evidence on behalf of the State.

We are convinced the errors of the court in the improper cross-examination of the witness June Chapman, and in allowing Irene Benton to be called as a court's witness and the improper questions propounded to the alibi witnesses, were prejudicial errors of such character as require a reversal of this case.

For the errors in the conduct of the trial, pointed out above, the judgment of the criminal court of Cook county is reversed and the cause remanded to such court for a new trial.                    *Reversed and remanded.*