(No. 44652.–

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. ALLEN SANDERS, Appellant.

*Opinion filed January 23, 1974.*

Chester A. Lizak and Warren Swanson, of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel, Assistant Attorney General, Kenneth L. Gillis and Thomas A. Mauet, Assistant State's Attorneys, and John B. Adams (Graduate Law Student), of counsel), for the People.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

The defendant, Allen Sanders, was indicted with Ralph Bellamy for the murder and armed robbery of Chicago police officer Joseph Ferguson and the attempted murder and armed robbery of Ferguson's partner, Daniel Cambric. Defendant's motion for severance was allowed, and on December 4, 1970, a jury in the circuit court of Cook County found defendant guilty of all charges. He was sentenced to imprisonment for a term of 75 to 100 years on the murder charge and to lesser concurrent sentences on the other charges. On this direct appeal he contends that he was denied due process of law by the improper introduction of certain evidence and by other alleged irregularities which occurred during the course of the trial.

Officer Daniel Cambric testified that on December 27, 1968, he and his partner, Joseph Ferguson, were on routine patrol duty in the vicinity of 38th Street and Indiana Avenue in the city of Chicago. Both men were in uniform riding in a marked blue and white squad car with a Mars light on top. At approximately 4:00 P.M. they observed the defendant and Calvin Hayden on the sidewalk near Brown's Funeral Home on Indiana Avenue. The officers stopped their car and were in the process of

placing the defendant under arrest when Ralph Bellamy approached with a gun in his hand pointed at the two officers. Bellamy said "Hold it!" and told the defendant to disarm the officers. Defendant thereupon proceeded to remove Cambric's fully loaded .38-caliber service revolver from Cambric's holster, and Bellamy took Ferguson's gun. Bellamy then pushed Cambric around to the rear of the squad car and told him to get in. As Cambric was opening the front door on the street side of the squad car he drew a second revolver which he had in a side pocket. The defendant said: "Look out! He has a second gun!" Defendant and Bellamy then opened fire. After ducking in the front seat on the street side of the car, Cambric raised up and fired back at defendant through the rear window. At this point, Officer Ferguson, the defendant, and Bellamy were on the sidewalk between the wall of the funeral home and the squad car. Cambric called on his police radio for assistance and then raised up again and fired another shot at defendant through the rear window. The defendant returned the fire. Cambric called again for assistance on the radio while other gunfire was taking place.

When the firing ceased, Cambric found his partner lying wounded on the sidewalk with Cambric's gun beside him. All of the shells which were in the gun when Bellamy removed it from Cambric's holster had been fired. When other police officers arrived on the scene Cambric and another officer ran down an alley in an unsuccessful attempt to find the defendant and Bellamy. When they returned to the scene of the incident, Ferguson, who was bleeding from the chest and mouth, was being placed in a police squadrol to be transported to Michael Reese Hospital where he later died.

A coroner's physician testified that Ferguson had bullet wounds in the left side of his neck, the right forearm and the right lower back and that death resulted from hemorrhage of the femoral artery in his left thigh. He

testified further that some wounds had resulted from a gun fired from the front while other wounds were caused by a gun fired from the rear. A microanalyst from the Chicago Police Department Scientific Crime Detection Laboratory stated that an examination of Officer Ferguson's jacket indicated that shots had been fired from a maximum distance of two to three feet. A firearms identification examiner testified that one of the three bullets removed from Ferguson's body was shot from Ferguson's .357-caliber service revolver and that the other two came from a .38-caliber Colt revolver which had been obtained from the Logansport, Indiana, Police Department, which had recovered the gun from a car in which Ralph Bellamy was arrested.

Immediately following the incident investigating police officers went to a nearby barbershop where they obtained a barber's license containing defendant's name and picture. After further investigation they went to a 15th-floor apartment at 3651 South Federal occupied by persons by the name of Henderson. They knocked on the door, were admitted to the apartment and obtained authority to search the apartment from Shirley Henderson. Upon entering a bathroom they observed a pair of men's bloodstained trousers in several inches of reddish colored water in a bathtub. They then entered a bedroom and found the defendant lying on a bed. After comparing the picture on the barber's license with the man lying on the bed they asked him his name. The defendant responded, "Leonard Henderson." Defendant was dressed in clean clothing, although a search of the bedroom in which he was found disclosed a bundle of men's clothing wrapped in wet paper under the bed. They also discovered a revolver bearing the inscription "Joseph Ferguson, No. 6892" in the bottom of a box containing women's clothing in the same room. Defendant, who had a bandage on the upper part of his chest, was taken to Michael Reese Hospital for treatment of gunshot wounds.

Shirley Henderson testified that on the morning of December 27, 1968, the defendant and Ralph Bellamy were in her apartment and left about noon. Later that afternoon she received a telephone call from a friend of the defendant by the name of Porterfield who asked her to come to a tavern at 37th Place and State Street. She went to the tavern at about 4:30 or 5:00 P.M. and noticed that the defendant had been injured. She took him back to her apartment in a taxicab, assisted him in removing his clothing and bandaged his wounds. She testified that she never saw a gun in his possession and that the first time she saw the gun found by the police was when they discovered it in the box under the bed.

Lester Frank, an unemployed bookie, testified that on the afternoon in question he walked out of a barbershop on Indiana Avenue and noticed "an arrest or something being made" involving the defendant and two other men. When shooting broke out Frank "hit the ground" in front of his car. His testimony as to what occurred thereafter can best be characterized as indefinite and somewhat contradictory. Although he saw something in the defendant's hand which looked like a gun, he could not state with certainty that it was in fact a gun. In an earlier statement given to police Frank indicated that Officer Cambric pulled his gun and started shooting, although during his testimony at the trial he explained that in making that statement he was not necessarily referring to the first shot that he witnessed.

Testifying in his own behalf, the defendant gave the following version of the events which occurred on December 27, 1968. On that morning he went to the apartment of Shirley Henderson and met Ralph Bellamy. They left the apartment at about 12:30 or 1:00 P.M. and stopped at several places and made some phone calls. The two men then separated temporarily, and defendant met his friend Calvin Hayden on the street. Hayden and defendant engaged in conversation, and Hayden was writing down a

telephone number when they were approached by officers Ferguson and Cambric, who took them to a squad car and placed them under what defendant described as a "routine arrest." At that point Ralph Bellamy arrived armed with a gun and said to Officer Cambric: "Let them go." Cambric turned his holster to Bellamy and said "Take it." No one took Cambric's revolver at that time, and the defendant was unaware that it was ever taken from him during the course of any of the subsequent events. However, Bellamy grabbed Cambric on the back of the neck and pointed a revolver towards Ferguson telling him "Don't do that." Bellamy then reached over and took Ferguson's revolver from his holster. Bellamy, who was then pointing two guns at all of those present, was asked by the defendant if there wasn't some way to clear up the matter by calling Cambric's commander at the police department. Cambric bowed his head in agreement and at defendant's request consented to place a call on his police radio. Cambric walked around the rear of the squad car and opened the front door. The defendant next saw Cambric pointing a gun through the door at them and hollered "Look Out." Cambric fired a shot hitting the defendant in the chest. Defendant fell to the ground and heard some more shots, although they seemed distant.

The next thing he remembered was Bellamy pulling him to his feet and going across a vacant lot to a tavern at 37th and State Streets where he went directly to the bathroom to examine the extent of his injuries. When he noticed that he was shot in the chest he started back out of the tavern to go home for medical attention. However, Bellamy was standing in the doorway and told him to wait, so he remained in the tavern and was served a drink. Bellamy laid one of the two guns in his possession on a table in the tavern and asked defendant if he wanted or needed it. Defendant testified that: "I didn't do anything with it. It was on the table." As the defendant was having the drink which had been poured for him, William

Porterfield walked in. Porterfield called defendant's fiancee, Shirley Henderson, who thereafter arrived and took him to her apartment. While Porterfield was in the tavern, he saw the gun on the table and asked defendant if it was his. Defendant replied in the negative. Porterfield then asked defendant if he wanted the gun, and defendant again told him no. At the time defendant left the tavern with Shirley Henderson, Porterfield was no longer there. Upon arriving at Shirley Henderson's apartment, the defendant went directly to her bedroom where she assisted him in removing his clothing and bandaging his wounds. Shortly after he put on dry clothing the police came, and he was arrested. Defendant denied that he ever took a gun from Officer Ferguson or that he ever had a gun in his hand on December 27, 1968.

On cross-examination, defendant explained that the reason he told police officers his name was Leonard Henderson when he was discovered in the Henderson apartment was that he assumed the police were looking for him and he did not want to go to jail. He further testified that he was planning to burn his clothing which had been wrapped in newspapers and placed under the bed.

Sheila Henderson, the daughter of Shirley Henderson, testified on behalf of the defendant that she was in her mother's apartment alone with her brother in the afternoon of the date in question when a man named Porterfield came to the apartment, handed her a gun and told her to put it away. She proceeded to take the gun to a back room where she put it in a box on the floor. When her mother returned to the apartment with the defendant she did not tell her about Porterfield's visit. She testified further that in an interview with an assistant State's Attorney later that day she told him that Porterfield brought the gun to the apartment. On rebuttal, the assistant State's Attorney to whom she spoke testified that in his prior conversation with Sheila Henderson she said that Porterfield had not brought a gun to the apartment.

Arnold Henderson, the 16-year-old son of Shirley Henderson, testified for the defendant that he accompanied his mother to the tavern and rode back to the apartment in a cab with the defendant and his mother. He noticed nothing unusual about the defendant and never saw a gun in the possession of either the defendant or his mother while in the cab or after they arrived in the apartment.

Prior to trial defendant moved to prohibit the State from introducing defendant's prior felony convictions after defendant testified on the grounds that such evidence would be highly prejudicial and would constitute a denial of due process of law. After a pretrial hearing on the motion, the trial court ruled that defendant's prior convictions for auto theft in 1945 and robbery in 1948 were too remote in time and could not be admitted. The court held, however, that the judgments entered on December 16, 1960, on defendant's pleas of guilty to five counts of armed robbery could be introduced for impeachment purposes if the defendant took the stand. During the trial, the defendant's five 1960 armed robbery convictions were admitted into evidence after the defendant testified. On appeal, defendant argues that the introduction of his prior armed robbery convictions was inconsistent with the rules for admission of such evidence set forth by this court in *People v. Montgomery* (1971), 47 Ill.2d 510, and was improper for the further reason that the convictions were introduced by the State for purposes other than impeachment.

In contending that the introduction of his five armed robbery convictions was improper, defendant relies to a substantial degree upon the applicability of the rules adopted by this court in the *Montgomery* decision with respect to the admissibility of prior convictions for impeachment purposes. In that case we reconsidered the construction of that part of the Criminal Code which provides in pertinent part: "No person shall be disqualified

as a witness in any criminal case or proceeding by reason of his interest in the event of the same, as a party or otherwise, or by reason of his having been convicted of any crime; but such interest or conviction may be shown for the purpose of affecting his credibility ***." (Ill. Rev. Stat. 1967, ch. 38, par. 155—1.) We there held that certain rules should be followed in the future by trial courts in the exercise of their discretion in determining the admissibility of prior convictions as affecting a defendant's credibility. However, since that case operates prospectively only, the rules specified therein on which defendant relies are not applicable to this case in which the judgments appealed from were entered prior to the date of the *Montgomery* decision. (*People v. Rossi* (1972), 52 Ill.2d 13.) Viewing this as a pre-*Montgomery* case, we are of the opinion that the defendant's prior convictions were properly admitted for impeachment purposes under the statutory provisions set forth above, and we deem it unnecessary to consider the argument advanced by the State that the convictions would have been properly admissible even if the *Montgomery* criteria were applied.

Apart from the *Montgomery* argument, defendant urges that the purposes for which his prior convictions were introduced were improper. During the course of the pretrial hearing on defendant's motion to exclude the introduction of his prior convictions at trial, the prosecutor argued that such convictions should be admissible not only for purposes of affecting the defendant's credibility but also to show motive, mental state, propensity for violent conduct and familiarity with police activity. We concur with the defendant that not all of the foregoing purposes were proper grounds for introduction of the prior convictions under the facts of this case. However, since the above argument on the motion to exclude the prior convictions was heard outside the presence of the jury and the jury was instructed that the evidence of the defendant's prior convictions was to be considered only insofar as

it might affect his credibility as a witness, we conclude that no prejudicial error resulted from the admission of those convictions.

We turn next to defendant's contention that the trial court erred in permitting the State to refer to the initial arrest of the defendant by officers Ferguson and Cambric. It will be recalled that this was the arrest that was taking place at the time that Ralph Bellamy approached with a gun. Prior to trial defendant filed a motion to suppress a revolver which the officers took from him during that arrest. The trial court granted the motion to suppress on the ground that there was no showing of probable cause for the arrest. At various times during the trial, the assistant State's Attorney made references to the initial arrest, and it is the defendant's contention that reference to an arrest which had previously been ruled unlawful deprived him of due process of law. We cannot agree with the defendant's contention in this respect. Whether the initial arrest was lawful or not, that arrest was an integral part of the sequence of events for which the defendant was on trial. The arrest was a fact which the jury necessarily had to know about in order to properly understand the events which followed, and in our opinion, the prosecution's reference to that event, which the defendant himself characterized as a "routine arrest," did not constitute prejudicial error under the facts of this case.

The defendant further argues that the trial court erred in permitting assistant State's Attorney Matthew Walsh to testify on rebuttal with respect to what Sheila Henderson had told him in a prior conversation. As we have previously related, Sheila Henderson testified for the defense on direct examination that a man named Porterfield came to her mother's apartment and gave her a gun with instructions to put it away. On cross-examination she was asked about a conversation she had with assistant State's Attorney Matthew Walsh in Area I Homicide Headquarters on the night of December 27, 1968, concern-

ing how the gun found in the apartment got there. She testified she told Walsh: "That Porterfield brought it there and that is how it got there." On rebuttal, Matthew Walsh was questioned about the conversation he had with Sheila Henderson on that date concerning the gun, and he testified: "I asked her if Mr. Porterfield had brought the gun into the apartment and she said he did not." There was no objection to Walsh's rebuttal testimony on the grounds of lack of improper foundation, although on the following day, defense counsel moved to strike Walsh's testimony on those grounds. The motion was denied.

Before a witness may be impeached by his prior inconsistent statement, he must be alerted concerning it in order to avoid unfair surprise and to afford him an opportunity to explain (*People v. Moses* (1957), 11 Ill.2d 84.) Proper foundation for admission of a prior inconsistent statement should normally consist of directing the attention of the witness on cross-examination to the time, place and circumstances of the statement as well as the substance of the statement itself. (*People v. Boulahanis* (1946), 394 Ill. 255; *People v. Perri* (1942), 381 Ill. 244.) The gist of defendant's contention is that there was a lack of proper foundation for Walsh's rebuttal testimony because Sheila Henderson was not asked on cross-examination if she had made the prior inconsistent statement, namely, that she had told Walsh in their prior conversation that Porterfield did not bring the gun to the apartment. We agree that the foundation for the rebuttal testimony was imperfect, but the fact remains that no timely objection to the admission of the rebuttal testimony on those grounds was made. In view of the fact that Sheila Henderson was questioned on cross-examination as to what she said to assistant State's Attorney Matthew Walsh at a particular time and place concerning a particular subject, it must have been obvious to the defense that Matthew Walsh's appearance as a witness for the People was to rebut Sheila Henderson's testimony as to what she had told him about

Porterfield. Defense counsel nevertheless did not object to Walsh's rebuttal testimony on the grounds of lack of proper foundation, and in our opinion the subsequent motion to strike the rebuttal testimony came too late.

The defendant next contends that the trial court erred in allowing the State to introduce into evidence the fact that when he was asked his name by police officers in the Henderson apartment he replied: "Leonard Henderson." The basis for his argument in this regard is that approximately 18 months prior to trial defense counsel filed a discovery motion to require the State to produce any statements made by the defendant. The State replied at that time that it was unaware of any oral or written statements of the defendant. Defendant now urges that his inculpatory response "Leonard Henderson" was a statement which should have been revealed in response to the discovery motion and that the State therefore should not have been permitted to introduce it into evidence. To these arguments the State responds *inter alia* that the defendant's contentions are premised on the provisions of Supreme Court Rule 412 which was inapplicable since it did not become effective until after the date of the trial in this case; that even if Rule 412 were applied the utterance "Leonard Henderson" was not a "statement" within the purview of that rule; and that the provisions of the Code of Criminal Procedure pertaining to the production of confessions (Ill. Rev. Stat. 1969, ch. 38, par. 114—10) was also not applicable since the defendant's response in question was not a "confession" within the scope of that section. It is not necessary to consider any of the above grounds relied on by the State, since it is apparent that in a hearing on a motion to suppress physical evidence held one week prior to trial the defendant was made aware of the testimony which he now contends was improper. At that pretrial hearing, Officer Joseph Wasilewski gave identical testimony to that which he gave during the trial concerning what the defendant said when he was asked his name.

Under these circumstances, defendant cannot be heard to complain that he was surprised or unfairly prejudiced by the introduction of Officer Wasilewski's testimony during the trial.

Prior to trial defendant petitioned the court for an order requiring that he and Officer Daniel Cambric be required to submit to polygraph examinations. In his motion he stipulated that the results thereof would be admissible at trial. In opposing the motion, the State refused to so stipulate, and defendant's motion was denied. We do not concur that the trial court erred in its ruling. Insofar as the defendant is concerned, the administering of a polygraph test would serve no purpose, since the results thereof would have been inadmissible on the issue of his guilt or innocence. (*People v. Nicholls* (1969), 42 Ill.2d 91; *People v. Durso* (1968), 40 Ill.2d 242; *People v. Nelson* (1965), 33 Ill.2d 48; *People v. Boney* (1963), 28 Ill.2d 505; *People v. Zazzetta* (1963), 27 Ill.2d 302.) As to Officer Cambric, we are aware of no authority for the proposition that a defendant in a criminal trial has a right to have a State's witness submit to a polygraph test.

The defendant also argues that the trial court erred in refusing to give his tendered instructions on the lesser included offense of involuntary manslaughter. In order to justify the giving of such an instruction it was necessary that there be some evidence in the record which could warrant conviction for involuntary manslaughter rather than murder. (*Cf. People v. McCrory* (1962), 25 Ill.2d 213.) The basic element of the crime of involuntary manslaughter is the reckless performance of such acts causing death as are likely to cause death or great bodily harm to some individual. (Ill. Rev. Stat. 1969, ch. 38, par. 9—3(a).) In our opinion the record before us does not contain any evidence from which a jury could conclude that the defendant was engaged in the type of reckless conduct which could support a conviction for involuntary manslaughter, and we conclude, therefore, that the trial

court did not err in refusing the tendered involuntary manslaughter instructions.

Defendant advances the further arguments that he was denied a fair trial by improper final argument by the assistant State's Attorney. We deem it unnecessary to discuss each of the allegedly improper remarks. We have considered them and believe that even when considered collectively they do not constitute prejudicial error.

The judgments of the circuit court of Cook County are affirmed.

*Judgments affirmed.*