THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MELVIN ELLIS, Defendant-Appellant.

First District (2nd Division)   No. 61194

Opinion filed August 10, 1976.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Michael E. Shabat, and Joan S. Cherry, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendant, Melvin Ellis, was charged with murder and two counts of attempt armed robbery. (Ill. Rev. Stat. 1971, ch. 38, pars. 9—1, 8—4, 18—2.) After a jury trial, he was found guilty of all charges and sentenced to concurrent terms of 30 to 90 years for murder and 1 to 3 years for each count of attempt armed robbery. Defendant now appeals.

Defendant presents three general issues for our review: (1) whether he was denied a fair trial by improper use of rebuttal testimony, prejudicial closing argument, and an inadequate jury instruction concerning impeachment; (2) whether he was proven guilty beyond a reasonable doubt; and (3) whether his sentence for murder was excessive. Due to the nature of the issues raised, a detailed recitation of the relevant evidence presented is necessary.

Richard Aguayo was called by the State and testified that he and his father, Alfred Aguayo, were in the alley behind their home at approximately 9:15 p.m. when two men approached them. One man was wearing a brown corduroy coat and a brown suede "sort of round" hat, and the other a black, knee-length fur coat. The one in the corduroy coat ordered them up against a wall. Richard and his father were now facing their assailants, the one in the corduroy coat directly in front of his father and the one in the black knee-length fur coat off to the side. There were

two overhead lights in the area, one approximately 10 to 15 yards from the occurrence and the other 20 to 25 yards from the occurrence. Richard could not see the face of the man in the brown corduroy coat because that individual's hat cast a shadow across his face, but he could see that he was approximately 5 feet, 11 inches tall, very close to his father's height. He could clearly see the face of the other individual in the black fur coat because the light was right in his face. The light was good enough to distinguish brown from black.

The individual in the brown corduroy coat said something to Alfred Aguayo, but Richard could not hear what was said. After his father responded to that comment, the individual in the brown corduroy coat struck Alfred Aguayo across the face with his right hand. Alfred Aguayo retaliated, hitting the man in the brown corduroy coat, causing him to fall back towards the middle of the alley. As he fell backwards, he gave directions to the man in the black fur coat to shoot Alfred Aguayo. Thereupon, the man in the black fur coat shot and killed Alfred Aguayo. After the assailants fled, Richard called the police. When they arrived he described one assailant as wearing a brown corduroy coat and the other as wearing a black fur coat.

The next day, in a lineup, Richard identified Robert Harris as the man who shot and killed his father. Following the lineup, Richard was shown a photograph of Charles Witherspoon, but was unable to identify Witherspoon as one of the assailants. He identified a hat and coat taken from defendant on the night of the shooting as the clothing worn by the assailant who did the talking on the night of the shooting. Finally, in court, he identified defendant "as similar in shape and size" to the person he saw wearing the brown corduroy coat.

On cross-examination, Richard was questioned about testimony he had given at the preliminary hearing during which he described the second assailant (nonshooter) as wearing a brown knee-length coat and a circular cap. As to the difference between cap and hat, he explained that he was not sure which term he used. Asked to elaborate on the exchange of blows between his father and the second assailant, Richard testified that the blow was to the assailant's cheek and strong enough to turn the assailant's head. After being shown a picture of Charles Witherspoon, Richard testified that the picture depicted marks and blood on Witherspoon's face. He could not positively identify defendant as the second assailant.

David Goodrich and Michael McGuigan, police officers, also testified for the State. They were in a marked squad car when they received a report of a shooting at approximately 9:30 p.m. As they neared the vicinity of the shooting, they observed a car containing three men speed away from the scene. After determining that the car was stolen, they gave chase. After about four blocks, the suspect's car stopped and Officer

Goodrich approached the car. However, the car suddenly sped away again, and the chase ensued. Pursuit ended when the suspect's car collided with another car in an alley.

All three occupants scurried from the car. One of the three, later identified as Charles Witherspoon, ran back towards the squad car, and as he passed, attempted to knife Officer McGuigan. McGuigan pursued Witherspoon, and as Witherspoon turned and threw his knife at McGuigan, the officer shot and killed Witherspoon. Witherspoon fell face down in the alley. At the time, he was wearing a black fur coat.

Meanwhile, Officer Goodrich had turned his attention to the two other individuals in the car. One of the two, later identified as Robert Harris, fired at Goodrich. Goodrich returned the fire and struck defendant. Harris fled but was soon apprehended. As both officers approached defendant, he said, "Don't shoot me, I didn't shoot that man, Peewee did it." Peewee was later revealed to be a nickname for Harris. Both officers identified the coat and hat that Richard Aguayo had earlier identified as the coat and hat defendant was carrying when apprehended. There were no marks on defendant's face, but Witherspoon, who had fallen face down, had blood on his right temple and right side of his face.

Sergeant Rinaldi arrived in an alley to investigate a shooting at approximately 9:30 p.m. When he arrived, he found uniformed police officers standing over the body of Charles Witherspoon, lying face down in the alley. Witherspoon was wearing a ¾-length black fur coat. He subsequently conducted a lineup from which Richard Aguayo identified Robert Harris as one of the assailants. Defendant was not in that lineup. He also showed a picture of Charles Witherspoon to Richard Aguayo but Richard could not identify Witherspoon as one of the assailants. Richard described one assailant to Rinaldi as wearing a ¾-length black fur coat and the other as wearing a fingertip-length brown corduroy coat. The coat recovered from defendant was a brown fingertip-length corduroy coat. The first opportunity Richard Aguayo had to observe defendant was during a preliminary hearing at which time he identified defendant as "similar in size and shape" of the second assailant.

The State then rested and defendant called Robert Harris to testify. Harris said that at approximatly 9:30 p.m. he, Charles Witherspoon, and defendant were in a car driving around. At one point, they stopped and after telling defendant they would be back, he and Witherspoon got out of the car. Defendant remained behind, in the car. Harris and Witherspoon then accosted the Aguayos in the alley. They returned to the car but told defendant nothing. Only after the collision did they tell defendant to get out of the car because it was stolen.

On cross-examination, Harris admitted that he and Witherspoon had grabbed the Aguayos to rob them and admitted doing the shooting.

Harris was specifically asked if he recalled telling Officer Drake, the officer who actually arrested him, that it was Witherspoon and not him that shot Alfred Aguayo. He recalled no such conversation. He was also asked if he recalled telling Assistant State's Attorney George Pappas that it was Witherspoon, not him, that shot Alfred Aguayo. Harris again denied making any such statement. Defendant never asked any questions when he and Witherspoon got out of the car, nor did defendant ask any questions as the car was speeding away from the police. Harris denied that Peewee was his nickname.

Defendant testified that he, Harris, and Witherspoon had been driving around when they stopped and Harris and Witherspoon got out of the car. Harris and Witherspoon merely said they would be back. They returned 10 to 15 minutes later and said nothing about where they had been. When the police started chasing them, he asked what was going on, but Witherspoon said nothing. Only after the collision did Witherspoon tell him to get out of the car because it was stolen. He never accosted the Aguayos.

On cross-examination, he admitted that the brown coat and hat identified by Richard Aguayo were his, and stated that both Harris and Witherspoon were wearing black coats. Defendant was specifically asked whether he recalled telling Sergeant Pates at the hospital that he did not shoot Alfred Aguayo, Peewee shot him. He did not recall such a statement. Defendant also did not remember telling the two officers who approached him in the alley that he did not shoot that man, Peewee did. Defendant did not ask any questions about why the police were chasing the car until they entered the alley.

In rebuttal, the State called Robert Harris and asked him if he had pled guilty to and been sentenced for the murder of Alfred Aguayo. He stated that he had. Also in rebuttal, Richard Aguayo testified that he sometimes uses the words, cap and hat, interchangeably to mean the same thing.

The State next called Sergeant Henry Pates in rebuttal. Sergeant Pates testified that in the hospital immediately after the shooting he asked defendant if he had shot Aguayo. Defendant replied that he did not shoot him, Peewee shot him. Peewee is a nickname for Harris. The witness also had a conversation with Harris later in the morning after the shooting. At that time, Harris denied shooting Aguayo, but stated that Witherspoon did the shooting.

Assistant State's Attorney George Pappas also testified in rebuttal for the State. He had occasion to question Harris after his arrest. In response to the question "what questions you asked of him and what he replied to you," the witness gave a narrative answer running two pages in the record. A summary of that narrative is as follows: on the night of the shooting Harris and defendant were in a car containing Charles

Witherspoon and Charlie Witherspoon (apparently brothers). After driving around, they arrived in the area of the eventual shooting and there "they had discussed the possibility of a robbery." They stopped and Charles and Charlie Witherspoon entered an alley. Harris and defendant got out of the car but remained near the car. Harris could see the two brothers accost two individuals and saw Charlie Witherspoon shoot one of the men. All four then got back in the car, and fled when later stopped by the police in another alley.

Also in rebuttal, Officer Drake testified that he assisted in arresting Harris, who told him that he and defendant were only passengers in a car containing two others. Finally, Officer Goodrich testified in rebuttal that when apprehended, defendant stated, "Don't shoot me. Don't shoot me. I didn't shoot that man."

Defendant first contends that he was denied a fair trial by the State's improper use of rebuttal testimony, prejudicial closing argument and an inadequate jury instruction. Defendant cites four instances of improper rebuttal: (1) the testimony of Robert Harris that he had pled guilty to and been sentenced for the murder of Alfred Aguayo; (2) the testimony of Sergeant Pates concerning his conversation with Harris; (3) the testimony of Officer Drake that Harris had told him four occupants were in the car on the night of the shooting; and (4) Assistant State's Attorney Pappas' recitation of his entire conversation with Harris.

Defendant notes that neither on direct nor on cross-examination was Harris questioned about any charges pending against him for his role in the murder of Aguayo. Since there had been no testimony on this subject, defendant argues that there was nothing to rebut and concludes that Harris' alleged rebuttal testimony was improper. The State responds that Harris' testimony had left the erroneous impression that he was placing himself in serious jeopardy by admitting in open court that he had fired the shot that killed Aguayo. The State concludes that since no reasonable man would subject himself to criminal prosecution for murder by lying to protect another, the State properly showed, on rebuttal, that Harris was not placing himself in any jeopardy since he had already pled guilty and been sentenced for his part in the crime.

■■ Both sides agree that rebuttal evidence is that which is adduced by the prosecution to explain, repel, or disprove material evidence given by defendant. (*People v. Daugherty*, 43 Ill. 2d 251, 253 N.E.2d 389; *People v. McGhee*, 20 Ill. App. 3d 915, 314 N.E.2d 313.) Since Harris had stated that his testimony was voluntary, it created the strong inference that he was testifying at great risk to himself. Under such circumstances, evidence that he had already pled guilty and been sentenced for the crime would certainly "explain" his candor and possibly "repel" the inference that he must be telling the truth. We conclude that since this evidence did

tend to explain Harris' prior testimony, it was the type of evidence proper for rebuttal. Under such circumstances, it was essential to fairness that the State be permitted to present this evidence to the jury. (*People v. Robbins*, 1 Ill. App. 3d 651, 274 N.E.2d 908.) However, we cannot totally condone the procedure used to present this evidence.

■■ The State called Harris as its rebuttal witness and then proceeded to impeach him through his prior conviction. However, it is a general rule that a party who calls a witness to testify cannot directly impeach that witness. (*People v. Wesley*, 18 Ill. 2d 138, 163 N.E.2d 500; *People v. Kelly* (1976), 39 Ill. App. 3d 190, 350 N.E.2d 163.) Specifically, it is error for the State to impeach its own rebuttal witness on direct examination with evidence of a prior conviction. (*People v. DeHoyos*, 31 Ill. App. 3d 12, 332 N.E.2d 643.) Rather, the correct procedure for presenting this evidence would have been for the State to request leave to recall Harris for further cross-examination. The recalling of a witness for further cross-examination rests in the sound discretion of the trial judge. (*People v. Sanders*, 5 Ill. App. 3d 89, 282 N.E.2d 742.) In the instant case, after defendant objected to the State's line of questioning in rebuttal, a conference was held in chambers. At that time, the trial judge correctly stated that although such questioning should have been conducted on cross-examination, he would allow it now in rebuttal. Since the only questions asked Harris on rebuttal concerned his plea of guilty, the actual result resembled cross-examination rather than rebuttal. Thus, although the procedure was labeled "rebuttal" which would have been improper in view of the general rule that a party cannot impeach its own witness, in essence, it was really further cross-examination which was proper in view of the trial judge's comments. We conclude that Harris' "rebuttal" testimony was of the nature that should have been pursued in cross-examination. Though mislabeled as "rebuttal" we perceive no prejudice.

Defendant next contends that the rebuttal testimony of Sergeant Pates and Officer Drake concerning their conversation with Harris was improper for lack of a proper foundation. In rebuttal, Sergeant Pates testified that Harris told him that he did not shoot Aguayo, rather, Witherspoon shot him. Officer Drake testified in rebuttal that Harris had told him that he was just one of four passengers in the car that night. However, Harris had not been questioned about either statement on earlier cross-examination.

In the instant case, Harris' trial testimony that he had shot Aguayo and that there were only three individuals in the car was impeached by prior inconsistent statements made to Pates and Drake. However, it is beyond dispute that before prior inconsistent statements can be offered for impeachment purposes, a foundation must be laid when the witness is cross-examined. (*People v. Powell*, 53 Ill. 2d 465, 292 N.E.2d 409; *People*

*v. Boulahanis,* 394 Ill. 255, 68 N.E.2d 467.) This rule is designed to alert the witness, avoid unfair surprise, and give him the opportunity to deny or explain the prior statement. (*People v. Sanders,* 56 Ill. 2d 241, 306 N.E.2d 865; *People v. Moses,* 11 Ill. 2d 84, 142 N.E.2d 1.) A proper foundation consists in the satisfaction of two distinct requirements: the witness must be asked as to the time, place, and persons involved in the alleged conversation; secondly, the witness must be asked whether he made a certain contrary statement at that time. *People v. Perri,* 381 Ill. 244, 44 N.E.2d 857; *People v. Byers,* 11 Ill. App. 3d 277, 296 N.E.2d 621.

■■ In the instant case, Harris was never questioned about any conversation he had with Sergeant Pates. Consequently, there had been absolutely no foundation laid for Pates' rebuttal testimony. (*People v. Brown,* 6 Ill. App. 3d 500, 285 N.E.2d 515.) On cross-examination, Harris had been asked whether he recalled telling Drake that he took part in the robbery, but that Witherspoon did the shooting. Drake's rebuttal testimony, however, did not cover this statement. Rather, Drake testified that Harris told him four occupants were in the car, a statement that was not asked of any witness in chief. We conclude that both Pates' and Drake's rebuttal testimony concerning Harris' prior statements was improper for lack of a proper foundation. *People v. Burch,* 22 Ill. App. 3d 950, 17 N.E.2d 136.

Assistant State's Attorney Pappas' rebuttal testimony presents an analogous but somewhat different question. On cross-examination, Harris was asked whether he told Pappas that it was not him that shot Aguayo, but that Witherspoon shot him. Consequently, when Harris denied making such a statement, Pappas' rebuttal testimony as to this statement was proper. However, Pappas' rebuttal testimony was not limited to that statement. Rather, Pappas was allowed to relate the entire conversation he had with Harris, including the fact that the car had four occupants, not three, and that the four, obviously including defendant, discussed the possibility of committing a robbery.

■■ To the extent that Pappas' rebuttal testimony covered matters about which Harris was not cross-examined, it was improper. For when an impeaching witness is produced, he may testify only concerning the statement in regard to which the prior witness had been questioned. (*People v. Payton,* 72 Ill. App. 2d 240, 18 N.E.2d 518.) He may not bring out every detail of a lengthy statement. (*People v. Bacon,* 2 Ill. App. 3d 3, 276 N.E.2d 782.) More importantly, Pappas' testimony that the occupants of the car, including defendant, had discussed the possibility of a robbery directly implicated defendant in the crime. However, where an impeaching statement bears directly upon defendant's guilt or innocence, it is not competent even for the purpose of impeachment before a jury. The prejudicial effect upon a jury would be too much. (*People v. McKee,*

39 Ill. 2d 265, 235 N.E.2d 62; *People v. Tunstall*, 17 Ill. 2d 160, 161 N.E.2d 300.) We conclude that most of Pappas' rebuttal testimony was improper. It went well beyond the realm of proper impeachment and directly implicated defendant in the crime.

The State concedes the lack of a proper foundation for the challenged rebuttal testimony. Instead the State argues that the testimony was not offered under the theory of prior inconsistent statements, but rather, was offered "to put Harris' testimony in a factual perspective different from that advanced by the defense." The State then concludes that the foundational requirements for impeachment are inapplicable.

The State places sole reliance on *People v. Gentry*, 19 Ill. App. 3d 861, 312 N.E.2d 441. In *Gentry*, the court did hold that rebuttal testimony that "put the defendant's testimony into a different factual perspective than that which was advanced by defendant" was proper. (19 Ill. App. 3d at 863.) However, the State fails to recognize that in *Gentry* there was no indication that the challenged rebuttal testimony consisted of prior statements. Indeed, *Gentry* had nothing to do with foundational requirements for impeachment. Rather, defendant's complaint in *Gentry* was that the challenged rebuttal testimony did not contradict or explain his direct testimony. The court's holding was thus merely a determination that the rebuttal testimony did, in a sense, contradict and explain defendant's testimony. We have no quarrel with such a holding, but find it inapposite to defendant's complaints in the instant case. Nor can we accept the State's bald assertion that the challenged testimony was not offered upon the theory of prior inconsistent statements. The record patently belies such a conclusion.

We conclude that the rebuttal testimony of Pates and Drake and most of the rebuttal testimony of Pappas was improper.

Defendant next argues that during closing argument the prosecutor attempted to impart substantive character to defendant's prior inconsistent statement and that this error was aggravated by an inadequate jury instruction.

On cross-examination, defendant denied telling Sergeant Pates that he did not shoot Aguayo, but Peewee shot him. Defendant therefore concedes that Pates' rebuttal testimony that defendant had, in fact, made that statement was proper rebuttal. However, defendant contends that certain comments made by the prosecutor during closing argument based on that rebuttal testimony were improper. During closing argument, the prosecutor commented:

> "He [defendant] had a conversation with Sergeant Pates according to Sergeant Pates' testimony. And during that conversation, he told Sergeant Pates, I didn't shoot him, Peewee did.
>
> Who was Peewee? Harris. How did he know Harris shot him

unless he had been right there, unless he had been the man struck by Mr. Aguayo. He had to to be.

* * *

Now what did he [defendant] say at that point? He said, I did not shoot that man, Peewee shot that man. And who is Peewee? Peewee is Robert Harris. Again corroborating the State's case." Defendant contends that, by such comments, the prosecutor improperly imparted substantive character to Pates' rebuttal testimony.

Defendant argues that a witness' prior inconsistent statement is received only for the purpose of impeaching the witness and not to prove the facts stated in the impeaching statement. (*People v. Collins*, 49 Ill. 2d 179, 274 N.E.2d 77; *People v. McKee*, 39 Ill. 2d 265, 236 N.E.2d 625.) In other words, a prior inconsistent statement offered to impeach a witness goes only to the witness' credibility and may not be considered as substantive evidence of defendant's guilt or innocence. Defendant argues that the prosecutor did just that. The prosecutor did not rely on Pates' testimony to attack defendant's credibility. He explicitly used it to "corroborate" the State's case. In two separate instances, he used defendant's prior inconsistent statement to prove that defendant must have been in the alley when Aguayo was shot.

In its only response to this argument, the State mistakenly argues that the proscutor was referring to similar testimony by Sergeant Pates during the State's case-in-chief. The State concludes that because evidence in its case-in-chief is substantive evidence of defendant's guilt the prosecutor could properly rely on this testimony to corroborate its case. However, the record reference the State directs us to in support of that argument is the closing argument which is now objected to. In fact, Sergeant Pates never testified during the State's case-in-chief. Despite this fact, we find Pates' rebuttal testimony substantive evidence of defendant's guilt for another reason.

■■ Defendant's prior statement to Pates was more than just a prior inconsistent statement, it was also an admission. An acknowledgment of facts by the accused which tends to establish guilt is an admission. (*People v. Stanton*, 16 Ill. 2d 459, 158 N.E.2d 47; *People v. Manske*, 399 Ill. 176, 77 N.E.2d 164.) Whether a defendant's statement tends to establish guilt so as to be an admission depends on a consideration of the evidence of the surrounding circumstances. (*People v. Griswold*, 405 Ill. 533, 92 N.E.2d 91.) In the instant case, defendant denied any knowledge of Aguayo's murder. Defendant testified that Harris and Witherspoon did not tell him what had happened when they left the car, nor did he ever ask them what they had done while gone. And despite his inquiries, he was not told why the police were chasing them. In light of this evidence,

defendant's statement that Harris shot Aguayo can only be construed to indicate defendant's presence in the alley at the time of the killing. For as the prosecutor commented, how else could defendant know that Harris did the shooting? In light of all the evidence, defendant's statement to Sergeant Pates was an admission tending to indicate his presence at, and hence his involvement in, the murder of Aguayo.

An admission is substantive evidence of defendant's guilt. When a crime has been committed, the admissions of a party charged with that crime are always admissible for the purpose of showing the guilt of the accused. *People v. Mosley*, 23 Ill. 2d 211, 177 N.E.2d 851; *People v. Niemoth*, 409 Ill. 111, 98 N.E.2d 733; *People v. Hobbs*, 400 Ill. 143, 79 N.E.2d 202.

■■ There is thus a distinction between impeachment of a nonparty witness and impeachment of an accused with an admission. When a nonparty witness is impeached with a prior inconsistent statement, that out-of-court statement may not be used as substantive evidence of defendant's guilt. (*People v. Bailey*, 60 Ill. 2d 37, 322 N.E.2d 804; *People v. Gant*, 58 Ill. 2d 178, 317 N.E.2d 564.) But when a defendant is impeached with a prior inconsistent statement amounting to an admission, that prior statement is admissible against him, not only as impeachment, but as proof of the truth of what he said. McCormick, Evidence §37, at 74 (2d ed. 1972), 31A C.J.S. *Evidence* §273 (1964).

This dual effect of defendant's admission, both as impeachment and as substantive evidence of his guilt is not altered by the fact that it was presented during the State's rebuttal. Although no Illinois decision has squarely considered the effect of an admission offered in rebuttal, one decision has suggested that such evidence cannot be considered as substantive evidence (*People v. DeBoise*, 35 Ill. App. 3d 298, 341 N.E.2d 483), while several other decisions have suggested that such evidence can be considered to corroborate the State's case-in-chief (*People v. Pelegri*, 39 Ill. 2d 568, 237 N.E.2d 453; *People v. Burnett*, 27 Ill. 2d 510, 190 N.E.2d 338; *People v. Griswold*), or to prove the accused's guilty intent or knowledge. (*People v. Carbona*, 27 Ill. App. 3d 988, 327 N.E.2d 546.) Moreover, other jurisdictions specifically allow admissions offered in rebuttal to be considered as evidence of defendant's guilt. (*State v. Green* (Mo. 1974), 511 S.W.2d 867; *People v. Underwood* (1964), 61 Cal. 2d 113, 389 P.2d 937, 37 Cal. Rptr. 313.) After a consideration of all these decisions, we conclude that the better reasoned approach would be to allow such evidence to be considered as substantive evidence. For the character of evidence should not be determined by when it is offered but rather by the type of evidence it is.

■■ In the instant case, defendant's statement to Pates became an admission only after defendant had testified. Until he testified,

defendant's knowledge of who shot Aguayo could have been acquired by either Harris or Witherspoon admitting the shooting in the car. As such, it could have been explained consistent with defendant's denial of any involvement in the shooting. But once he had testified that he was never informed of what had happened in the alley, Pates' rebuttal testimony not only impeached defendant's statement that he had not talked with Pates but also tended to establish defendant's guilt by placing him in the alley when Aguayo was shot. The State thus offered this testimony at the earliest opportunity after it had become relevant. The fact that this opportunity was during rebuttal does not alter the character of the evidence presented. The reasons underlying an admission's use as substantive evidence (McCormick, Evidence §262 (2d ed. 1972)) are as valid during rebuttal as during the State's case-in-chief. Moreover, if the only objection to the substantive use of this testimony was that it was offered during rebuttal, the State would merely have to ask to reopen its case-in-chief. We conclude that in so far as Pates' rebuttal testimony related an admission by defendant, it could be considered by the jury as substantive evidence of defendant's guilt. Consequently, there was no error in the prosecutor's remarks during argument defendant now objects to, nor was there any need to instruct the jury concerning those remarks.

In summary, although we find no error in the closing argument of the State, we conclude that there was error in the rebuttal testimony of Pates concerning Harris' statement, the rebuttal testimony of Pappas directly implicating defendant in the robbery, and the rebuttal testimony of Drake corroborating Pappas' testimony. The effect of this error will be considered in the context of defendant's reasonable doubt argument.

Defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt. In this regard, defendant's argument is premised entirely on two alleged discrepancies: (1) although, in court, Richard Aguayo identified defendant's fingertip-length brown corduroy coat as the coat worn by the nonshooting assailant on the night of the murder, during a preliminary hearing he described the coat as "long, down to about his knees," and (2) although Alfred Aguayo had struck the second assailant on the cheek, defendant had no facial injuries and Witherspoon did have a bruise near his cheek.

There can be no doubt that at the preliminary hearing, Richard Aguayo did describe the second assailant's coat as long, down to his knees, and that the coat admitted into evidence and actually identified by Aguayo was fingertip-length. However, at trial, Aguayo consistently testified that the coat was fingertip-length and was corroborated in this regard by Rinaldi's testimony concerning the description he received from Aguayo shortly after the shooting. This discrepancy, for whatever it was worth, was brought to the jury's attention twice during the several examinations

of Aguayo and was commented on by counsel during closing argument. As a result, it was a classic matter for resolution by the jury. Discrepancies in testimony do not render that testimony unworthy of belief, but go only to the weight to be given that testimony. (*People v. Hanna*, 42 Ill. 2d 323, 247 N.E.2d 610.) Any contradiction between a witness' testimony at trial and a preliminary hearing is a matter of credibility for the jury to determine. *People v. Webb*, 25 Ill. App. 3d 580, 323 N.E.2d 474.

■■ Defendant's second argument concerning the lack of a facial bruise on defendant and the presence of a bruise on Witherspoon is based on pure speculation. Although Richard Aguayo testified that his father struck the second assailant on the cheek with enough force to turn the assailant's head, there was no testimony that the assailant definitely received a bruise from that blow. Moreover, it was undisputed that Witherspoon fell face down in the alley when he was shot. Under such circumstances, it was for the jury to determine whether Witherspoon received his facial bruises as a result of being struck by Aguayo or as a result of falling in the alley. Since there was no direct evidence presented concerning any facial bruise, it was for the jury to draw reasonable inferences from the evidence. (*People v. Zuniga*, 53 Ill. 2d 550, 293 N.E.2d 595.) It is the function of the jury to weigh the testimony and determine factual matters in debatable sets of circumstances. (*People v Hairston*, 46 Ill. 2d 348, 263 N.E.2d 840.) In the instant case, there is nothing inherently improbable about the jury's resolution of either the conflict in Richard Aguayo's testimony or in the absence of a bruise on defendant's face.

Rather, the jury was presented with an individual admittedly in the presence of the confessed murderer. The coat and hat identified by Richard Aguayo as the clothing worn by the second assailant was admittedly the clothing worn by defendant on the night of the shooting. Defendant was "similar in size and shape" to the second assailant. Although defendant attempted to suggest that Witherspoon was the second assailant, it was undisputed that Witherspoon was wearing a black fur coat and despite any dispute as to its length, there was never any dispute that the second assailant wore a brown corduroy coat. Defendant's testimony that despite a high speed police chase of the car he was in, he never inquired about the reason for that chase, could also be considered by the jury. Finally, the jury could consider defendant's testimony that he was never told of the shooting with Officers McGuigan's and Goodrich's testimony that defendant told them Peewee shot Aguayo.

■■ Identification need not be positive to support a conviction, its weight being a question for the jury to be determined in connection with the other circumstances of the case. (*People v. Oswald*, 26 Ill. 2d 567, 187

N.E.2d 685.) Defendant was the same height and physiognomy as the second assailant, was wearing the same clothing as the second assailant, and by his statement to the arresting officers indicated knowledge of the shooting. Additionally, defendant's own explanation of his behavior during a high speed police chase was, to say the least, unusual. When all this evidence is viewed together there was sufficient evidence which, if believed, proved defendant guilty beyond a reasonable doubt.

■■ However, as noted earlier, there was a substantial amount of improper evidence. While there was sufficient competent evidence to prove defendant guilty beyond a reasonable doubt, it cannot be ignored that the evidence was primarily circumstantial and required the jury to draw several crucial inferences. In this balanced situation, it is important that the scale not be tipped by improper evidence. (*People v. Allen*, 36 Ill. App. 3d 821, 344 N.E.2d 825.) If from the competent evidence admitted, the jury entertained any doubt that defendant was guilty, it would be difficult, if not impossible, to remove the impression of guilt which would follow from such error. (*People v. Tunstall.*) In this regard, we are especially troubled by Pappas' testimony implicating defendant in the robbery, and the seeming corroboration of this testimony by Drake. To a large degree, the instant case turned on the jury's resolution of defendant's and Harris' credibility. It was their word that defendant was not involved against evidence that he was. With the evidence so closely balanced, we cannot say that the jury would have returned the same verdict absent Pappas' testimony that everyone in the car had discussed committing a robbery. Under such circumstances, we cannot say that the error was harmless beyond a reasonable doubt. Accordingly, the cause must be reversed and remanded for a new trial.

Since this cause must be remanded for a new trial, we need not consider defendant's argument regarding his sentence. Nor need we consider defendant's argument concerning improper closing argument by the State beyond stating that, in several instances, the prosecutor made comments clearly not based on the record. At a new trial, we assume the State will confine itself to inferences based on the record.

For the reasons stated above, the cause is reversed and remanded for a new trial.

Reversed and remanded.

DOWNING and JIGANTI, JJ., concur.